BOLIN, Justice.
*980 Charles Brookins Taylor and others identified later in this opinion appeal from an order of the Choctaw Circuit Court holding that Taylor was rightfully removed as the pastor of the Paradise Missionary Baptist Church ("PMBC").
Facts and Procedural History
PMBC was organized in 1993 by Lenora Ray, her late husband Harding Ray, and Thelma Taylor. The members of PMBC initially held church services in Lenora's home until the church acquired property at 1106 East Pushmataha Street in Butler. A $20,000 gift to PMBC by Lenora and her late husband made it possible for the church to acquire the property. PMBC has, since its inception, been affiliated with the Gilfield District Missionary Baptist Association, the Alabama State Missionary Baptist Convention, and the National Baptist Convention. Although PMBC is affiliated with those entities, they do not control PMBC; it remains, as described in the church's bylaws, a "self-determining-autonomous body under the Lordship of Jesus Christ." Charles Brookins Taylor, Thelma's brother, became the pastor at PMBC in 2007.
On August 18, 2010, the members of the congregation of PMBC decided to organize PMBC as a domestic nonprofit corporation pursuant to § 501(c)(3) of the Internal Revenue Code. Also on August 18, 2010, the members of PMBC voted to adopt bylaws. Article 3 of the bylaws sets forth PMBC's purpose as being "to advance the Kingdom of Jesus Christ." Article 4 of the bylaws sets forth PMBC's mission statement: "The mission of PMBC is (1) to be a purpose driven church, 'a church that acts on faith'-Heb. 11:1-6; (2) to practice the Great Commission-St. Matthew 28:19-20, and the Great Commandment-St. Matthew 22:34-40; and (3) to glorify God by ministering to the spiritual and Human needs in the name of Christ." Article 6 provides that PMBC is a "self-determining-autonomous body under the Lordship of Jesus Christ," the government of which "is vested in the body of the believers who compose it," and that it is "subject to the control of no other ecclesiastical body." Article 7 of the bylaws states that "PMBC receives the Scriptures as its authority in matters of church and practice." Matters of church discipline are found in Article 9. Article 9.02 provides:
"TERMINATION OF MEMBERSHIP: Any person may be terminated from membership by any of the following methods:
"A. By Letter. Any member in full and regular standing who desires a letter of recommendation to a designated church of like faith and order, is entitled to receive it upon his/her request, and such a letter shall be granted by PMBC.
"B. Uniting with another church. If a member of PMBC unites with another church his or her membership in PMBC is terminated automatically.
"C. By exclusion. A member is dismissed after recommendation by the pastor and deacons, and by a vote of the church due reasons and circumstances provided in ARTICLE 9, section 4-Church Discipline. The pastor and deacons will do all they can to counsel the member for restoration prior to action of dismissal or a request of the member to be dismissed from church membership.
*981 "D. INACTIVE MEMBERS. When a person has manifested a lack of interest in the support and life of PMBC for a year by failure to attend services, to communicate with PMBC, or to contribute to it through tithing and general offering, his/her name may be placed on the Inactive List upon recommendation of the pastor and deacons, and confirmed by PMBC.
"1. Persons whose names are on the inactive membership list shall not be counted or reported as members and shall not take part in church business meetings or be eligible to vote or to hold office.
"2. Any person whose name is on the inactive membership list may be reinstated to active membership by recommendation of the Pastor and Deacons, and majority vote of the church.
"E. PROLONGED INACTIVE MEMBER. The church may, after faithful efforts to make such action unnecessary, ... terminate the membership of persons ... whose names appear on the inactive membership rolls for at least (3) consecutive years. The church shall keep a permanent list of such persons."
Article 9.04 provides:
"A. Should any unhappy difference arise among members, the aggrieved member shall follow a tender spirit, the rules given by our Lord in St. Matthew 18:15-17. If the issue is not resolved, the aggrieved member then takes the issue before the Deacons.
"B. Should any case of gross breach of covenant and doctrine, or of public scandal, occur, the Deacons in counsel with the pastor shall endeavor to resolve the conflict, and if this effort fails, shall report the case to the church. The offender, at this stage of resolution, shall not hold a leadership role in the church, pending further action taken by the church.
"C. All such proceedings shall be pervaded by a spirit of Christian kindness and Forbearance, but should and adverse decision be reached, PMBC may proceed to Admonish or declare the offender to be no longer in the membership of PMBC."
Article 11 of the bylaws addresses PMBC's leadership and states that "[t]he leadership of the church shall consist of the Pastor, Deacons Ministry, Trustee Ministry, Women Missionary Ministry's President, Financial Secretary, Treasurer, Sunday School Superintendent, Church Clerk, Director of Christian Education, and Presidents of all other designated Adult Ministries. The leaders shall form the Joint Committee of PMBC." Article 12 provides that the pastor of PMBC is an ecclesiastical officer of the church. Finally, Article 14 of the bylaws addresses the dismissal of the pastor:
"The Pastor shall be considered for dismissal from PMBC only after the alleged charges(s) has been fully investigated and which must include the following steps: (1) The Deacons Ministry and the Joint Board must meet with the Pastor; (2) if PMBC Deacons and Joint Board find the alleged charges to be non-meritorious, no further action is taken; (3) if the Deacons Ministry and PMBC's Joint Board decide[ ] the alleged charges to be meritorious, a written notice containing the specifications of the charge(s) as alleged shall be given by certified mail, return receipt requested[,] to the Pastor at least 14 days prior to a special meeting to be held for this purpose and the pastor shall be accorded an opportunity to defend himself against such charges including the right *982 of counsel. In the event such charges are not sustained, the pastor shall resume the duties of the pastor and the church shall be responsible for the payment of reasonable counsel fees incurred by the pastor in defending himself against such allegations."
By 2012, PMBC's membership of 16 persons had fractured into 2 groups. It is alleged that the congregation had become dissatisfied with Taylor's service as pastor at PMBC and that Taylor and his close relatives had "started taking over the church" and were behaving in such a way as to have "forced other members from attending church." Taylor headed one group of eight church members, and Lenora, a church trustee, headed the other group of eight church members.
On July 20, 2012, Lenora sent Taylor a letter by certified mail informing him of a specially called meeting to be held at PMBC on August 28, 2012. The letter requested Taylor's attendance at the meeting and indicated that the purpose of the meeting was to decide the issue of Taylor's continued service as pastor at PMBC. The letter gave no "specifications of the charge(s) alleged" against Taylor. It appears from the record that Taylor refused service of this certified letter on three occasions.
In the meantime, a special meeting of PMBC was convened on August 5, 2012, by Taylor's eight-member group. Taylor presided over this meeting and stated that Lenora had not attended any church services since July 8, 2012, and had performed acts that prevented other members and friends from conducting religious services at PMBC. Carolyn G. Taylor, the chairman of the PMBC Board of Trustees ("the Board") and Taylor's wife, moved to seek a restraining order against Lenora to prevent her from attempting to keep Taylor and the members from entering the PMBC or engaging in any other action designed to prevent Taylor and the members present at the meeting from exercising their right to worship at PMBC.
Also at this special meeting, Thelma, a founder and former trustee of PMBC, moved to have Lenora removed as a trustee of PMBC and to nominate Rose E. Taylor-a sister of Taylor's and the clerk of PMBC-as a trustee to the Board. Finally, Thelma moved those members present to approve by a vote of affirmation Taylor's continued service as the pastor of PMBC. Each of these actions was approved by a unanimous vote of those present.
On August 28, 2012, a "mutual" council met with PMBC. The council's purpose was to serve as an advisory body for PMBC and consisted of the following representatives: Reverend Pettus L. Lockett of the Kinterbish District Baptist Association ("the Kinterbish association"); Reverend Theodis McSwain of the Gilfield District Missionary Baptist Association ("the Gilfield association"); and Reverend Jasper Irby of the Gilfield association. Taylor did not attend this meeting. Reverend Lockett expressed his "sadness" that Taylor was absent, having been afforded the opportunity to "vindicate himself of the charges forwarded by the church." The council advised PMBC to "strive to restore harmony" and suggested a seven-day restoration period. Although the council had advised PMBC to "strive to restore harmony" and suggested a restoration period, it appears from the church minutes[1] that five members of PMBC present at this *983 meeting voted to dismiss Taylor. Taylor was informed of the action taken at the meeting and responded by telling Lenora that she had no authority to call the meeting.
On September 12, 2012, a special meeting was held at PMBC that appears to have been attended by eight church members. The purpose of the meeting was to verify the expiration of the seven-day restoration period given Taylor at the August 28, 2012, meeting. Reverend Irby stated at this meeting that "nothing could be done to over-rule any decision made by the church" in the previous meeting held on August 28, 2012. Reverend O.L. Sealey, a representative of the Gilfield association, moved at this meeting that the decision made at the meeting on August 28, 2012, to remove Taylor as the pastor of PMBC be upheld. Lenora seconded this motion. Taylor was provided notice that his services as pastor were terminated effective September 17, 2012.
On October 4, 2012, Taylor informed Lenora by letter that the meetings held on August 28, 2012, and September 12, 2012, were unauthorized and that they were held without following PMBC's bylaws; that the Gilfield association had no authority over PMBC and was not authorized to call a "mutual" council; that she had been removed as a trustee of PMBC on August 5, 2012; and that he did not accept the results of the unauthorized meetings of August 28, 2012, and September 12, 2012. Taylor requested that Lenora "cease and desist from acting outside the jurisdiction and the membership body of [PMBC]."
On January 10, 2014, PMBC, Lenora, Rosie Drummond, Vernon L. Harbin, and Billy Ray (hereinafter collectively referred to as "the Ray plaintiffs") sued Taylor, Carolyn, Rose, and Thelma (hereinafter collectively referred to as "the Taylor defendants") seeking injunctive relief. The Ray plaintiffs alleged, among other things, that Taylor had behaved in such a bullish and domineering manner as the pastor of PMBC that the only regular attendees of PMBC are his close relatives; that Taylor insisted on controlling everything in the church and had created an atmosphere where others feel unwelcome; that during a church meeting Taylor was verbally abusive to Ray; that Taylor has conducted specially called meetings in violation of PMBC's bylaws; and that Taylor and the other defendants have appropriated church assets for their own use and control.
The Ray plaintiffs sought an order from the trial court finding that Taylor's termination as the pastor of PMBC was valid and requiring the Taylor defendants to return all church documents, records, and bank accounts in their possession. The Ray plaintiffs also sought to enjoin Taylor from claiming to be the pastor at PMBC and to enjoin the Taylor defendants from "conspiring and claiming that they are the Church and controlling all aspects of the Church"; from holding themselves out as having sole and exclusive authority to act on behalf of PMBC; and from disrupting church activities and harassing church members.[2]
On February 17, 2014, the Taylor defendants moved the trial court to dismiss the Ray plaintiffs' complaint, arguing, among other things, that the complaint failed to state a claim upon which relief could be granted; that the trial court lacked the jurisdiction to remove a church pastor and "to interfere with the 'spiritual' or 'ecclesiastical'
*984 affairs of any Church"; that the removal of a pastor is an ecclesiastical matter rather than a civil matter; and that the alleged removal of Taylor as the pastor of PMBC was invalid because PMBC's bylaws were not followed in removing him. The Taylor defendants supported their motion to dismiss with exhibits.
On March 6, 2014, the Ray plaintiffs filed a response in opposition to the motion to dismiss in which they contended that they were not asking the trial court to interfere with the "spiritual" or "ecclesiastical" affairs of the church by removing Taylor as pastor of PMBC because they contended that Taylor had already been removed as the pastor of PMBC by a majority vote of the congregation. The Ray plaintiffs stated that they were requesting an order upholding Taylor's removal as the pastor of PMBC. The Ray plaintiffs alleged that "a majority of the members of [PMBC] held a valid meeting, a meeting in which [Taylor was] given proper notice to attend, and by a majority vote, voted to remove [Taylor] as pastor." Relying upon In re Galilee Baptist Church, 279 Ala. 393, 186 So.2d 102 (1966), the Ray plaintiffs argued that the trial court had jurisdiction of this matter because they were seeking an order determining that Taylor's removal as the pastor of PMBC was valid and had been accomplished in accordance with the bylaws of PMBC.
On April 30, 2015, the Taylor defendants filed their brief in support of their motion to dismiss, to which they attached a number of exhibits. On June 8, 2015, the Ray plaintiffs filed their brief in response, supported with a number of exhibits. On December 16, 2015, the trial court heard the parties' oral arguments in support of their briefs.[3] On May 20, 2016, the trial court entered the following order, which reads, in part:
"The Court has reviewed the legal briefs submitted by the parties and has heard oral arguments from counsel.
"This Court is extremely disappointed and saddened that a matter such as this has made its way into the judicial process. Spiritual matters are best left to each particular church and its congregation to resolve. However, given the present posture of this situation, this Court is forced, however reluctantly, to make a determination of certain issues involving [PMBC].
"In arriving at a decision, the Court is relying heavily on the Alabama Supreme Court's recent opinion in Ex parte Tatum, 185 So.3d 434 [ (Ala. 2015) ]. It is this Court's opinion that Ex parte Tatum is a road map for circuit courts in Alabama when determining church disputes.
"A circuit court lacks subject matter jurisdiction to apply judicial notions of due process to church proceedings when the highest adjudicatory body of a church decides a purely ecclesiastical matter. However, the mere fact that the subject matter of a church dispute concerns an ecclesiastical or spiritual issue does not preclude a circuit court from recognizing a decision rendered by the highest adjudicatory body of a church and, based on that decision, enjoining persons from taking unauthorized actions on behalf of the church.
"In the present case, the Court concurs with the opinion in Ex parte Tatum that it lacks subject-matter jurisdiction to apply notions of due process to a church proceeding to remove the pastor of that church, but the Court does have the ability to recognize that a decision made by the majority of the members of [PMBC] to remove Defendant, Charles *985 Brookins Taylor, as the pastor was a valid decision. In affirming such action of the church, the Court can also enjoin the Defendant, Charles Brookins Taylor, from taking unauthorized actions on behalf of the church.
"In a Baptist church, the majority of the congregation is the highest adjudicatory body, unless the church bylaws provide otherwise. In a Baptist church, the majority of the members of the church control the business of the church. Each Baptist church is within itself a pure democracy; it is the right of the majority to rule; the will of the majority having been expressed; it becomes the minority to submit; church action is final. The church may remove the pastor at any appropriate time it deems necessary. Thus in the church, the highest adjudicatory body of the church with respect to removing a pastor is a majority of its members.
"It is apparent from the legal briefs and oral arguments of counsel that, even though the bylaws of [PMBC] did provide for boards to be established and persons to be appointed to those positions to make decisions for the church, no such boards existed at the time of the August 28, 2012, meeting and the bylaws did not specifically state that the majority of the congregation would not be considered the highest adjudicatory body of the church. While after July 2013, the Court recognizes that a question arose as to the active membership of [PMBC], it is apparent from the legal briefs and oral arguments of counsel that the [Ray plaintiffs] and the other members who voted to remove the Defendant, [Taylor,] as the pastor of [PMBC] on August 28, 2012, did constitute a majority of the membership of [PMBC] and therefore their decision to remove the pastor shall be affirmed.
"....
"The Court finds that the August 28, 2012, meeting held by the [Ray] Plaintiffs and other members of [PMBC] to remove the Defendant, [Taylor], as pastor of [PMBC] and approved on September 12, 2012, was a valid meeting held by the majority of the membership of said church and that their decision to remove the Defendant, [Taylor], as pastor is hereby affirmed;
"That the Defendant, [Taylor], is hereby removed as pastor of [PMBC] by a majority vote of the membership effective immediately and said leadership and/or control of the church shall be vested with the [Ray] Plaintiffs and other members of [PMBC]."
On June 1, 2016, the Taylor defendants moved the trial court to alter, amend, or vacate its judgment, which motion was denied by operation of law. The Taylor defendants have filed this timely appeal.
Standard of Review
The Taylor defendants asserted in their motion to dismiss both that the complaint failed to state a claim upon which relief could be granted and that the trial court lacked the jurisdiction to remove a church pastor and "to interfere with the 'spiritual' or 'ecclesiastical' affairs of any Church." Although the Taylor defendants had based their motion to dismiss in part on a failure to state a claim upon which relief could be granted, pursuant to Rule 12(b)(6), Ala. R. Civ. P., the substance of the motion is one arguing lack of subject-matter jurisdiction under Rule 12(b)(1), Ala. R. Civ. P. Although the Taylor defendants give a passing reference to the failure of the Ray plaintiffs' complaint to state a claim upon which relief could be granted, the Taylor defendants argued in their motion to dismiss, and in their supporting brief, that the trial court lacked subject-matter jurisdiction to remove a pastor because *986 the removal of a pastor from the pulpit is a purely ecclesiastical matter with which a temporal court has no jurisdiction to interfere. It is the substance of the motion that determines what kind of motion it is. Evans v. Waddell, 689 So.2d 23 (Ala. 1997). Accordingly, we will treat this motion as one to dismiss for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1), Ala. R. Civ. P.[4]
"We review de novo whether the trial court had subject-matter jurisdiction." Solomon v. Liberty Nat'l Life Ins. Co., 953 So.2d 1211, 1218 (Ala. 2006). See also McClendon v. Pugh, 49 So.3d 1238, 1240 (Ala. Civ. App. 2010) (rejecting an assertion that the dispute was ecclesiastical in nature, holding that the trial court had subject-matter jurisdiction, and citing this Court's decision in Ex parte Terry, 957 So.2d 455, 457 (Ala. 2006), for the proposition that the decision as to subject-matter jurisdiction in such a case is a question of law, which an appellate court reviews de novo).[5]
Discussion
The Taylor defendants initially argue that Taylor's alleged termination as pastor of PMBC involves a purely ecclesiastical matter and that, therefore, the trial court lacked the jurisdiction to consider the allegations contained in the Ray plaintiffs' complaint.
This Court has stated:
"It is firmly established that courts decline to assume any jurisdiction as regards the purely ecclesiastical or spiritual feature of the church.
"On the other hand, in many cases we have recognized the right and duty of civil courts to exercise jurisdiction to protect the temporalities of the church, such as where civil rights or rights of property are involved."
Williams v. Jones, 258 Ala. 59, 61, 61 So.2d 101, 102 (1952) (citations omitted). Further, "[a]s is the case with all churches, the courts will not assume jurisdiction, in fact [have] none, to resolve disputes regarding their spiritual or ecclesiastical affairs. However, there is jurisdiction to resolve questions of civil or property rights." Abyssinia Missionary Baptist Church v. Nixon, 340 So.2d 746, 748 (Ala. 1976) (citing Williams, supra ). As it pertains to the removal of a minister from the church's pulpit, this Court has stated:
"The civil courts will not take jurisdiction of a controversy arising out of the removal of a minister if the right to the position is merely spiritual or ecclesiastical. But if he has a civil or property right in his position, the civil courts will protect that right. But if there is such right in the minister, which will give the courts jurisdiction, it is well settled that his removal by the appropriate church tribunal is conclusive upon the courts, if there is no violation of contractual right."
*987 Odoms v. Woodall, 246 Ala. 427, 429, 20 So.2d 849, 851 (1945). See also Putman v. Vath, 340 So.2d 26 (Ala. 1976).
The trial court was correct in its initial determination here that it lacked subject-matter jurisdiction to adjudicate the matter of Taylor's removal as the pastor at PMBC. Article 12 of PMBC's bylaws provides that the pastor of PMBC is an ecclesiastical officer of the church. Neither the Taylor defendants nor the Ray plaintiffs have asserted that Taylor possesses a property right in his position as the pastor of PMBC. The Taylor defendants have argued that the matter presented here is purely ecclesiastical in nature and that the trial court lacks jurisdiction. The Ray plaintiffs have argued that the trial court has subject-matter jurisdiction over this matter but that jurisdiction is not based on a property right held by Taylor; rather, they contend, the trial court has jurisdiction over the matter to determine whether Taylor's removal as the pastor of PMBC was valid and accomplished in accordance with the church's bylaws.[6] Simply put, the matter of Taylor's removal as the pastor of PMBC based on his alleged bad behavior at its core is purely an ecclesiastical matter as to which the trial court lacked subject-matter jurisdiction to adjudicate. This conclusion, however, does not end our inquiry.
As noted above, "it is well settled that [a pastor's] removal by the appropriate church tribunal is conclusive upon the courts, if there is no violation of contractual right." Odoms, 246 Ala. at 429, 20 So.2d at 851. "The question then arises as to the jurisdiction of the court to go behind the decision of that tribunal to inquire into its jurisdiction and regularity of its proceedings...." Id. Although the trial court concluded in its order that it lacked subject-matter jurisdiction to remove Taylor as the pastor of PMBC, it went on to conclude that it had subject-matter jurisdiction to determine whether the removal of Taylor was valid under church law.
In Barton v. Fitzpatrick, 187 Ala. 273, 65 So. 390 (1914), a dispute over whether to remove W.F. Fitzpatrick from the pulpit divided the congregation of the Peace Baptist Church. A majority of the board of deacons backed Pastor Fitzpatrick and prohibited the matter of his removal from being presented to the full congregation. Eventually, a deacon opposed to Pastor Fitzpatrick rose during a worship service and gave notice of a meeting to be held for the purposes of declaring the pastorate vacant and electing a new pastor. The call *988 for the meeting was not approved by Pastor Fitzpatrick or a majority of the board of deacons. The meeting nonetheless took place, and the congregation voted to remove Pastor Fitzpatrick from the pulpit and to replace him with J.P. Barton. The newly appointed Pastor Barton and his followers took possession of the church property. Fitzpatrick and certain deacons brought an action seeking a determination as to the right to the possession and control of the church property and an order restoring him to the pastorate of the church. Fitzpatrick contended that the meeting in which he was removed from the pulpit was held in contravention of established church law. The trial court agreed and entered a judgment in his favor. In undertaking to decide the issues presented, this Court stated:
"The pastor of a church in his pastoral office performs a spiritual function. Spiritualities are beyond the reach of the temporal courts. It follows that a church which has employed a pastor, though the employment be for a fixed term and at a fixed salary, may at any time, so far as the civil courts are concerned, depose him from his spiritual office, subject only to inquiry by the courts as to whether the church, or its appointed tribunal, has proceeded according to the law of the church."
187 Ala. at 280, 65 So. at 392-93. This Court held that the actions taken to remove Pastor Fitzpatrick from the pulpit were "irregular, and without authority of the church law." Id.
In In re Galilee Baptist Church, 279 Ala. 393, 186 So.2d 102 (1966), Thomas Thornes was serving as pastor of the Galilee Baptist Church when the congregation split into two factions over whether Pastor Thornes should continue to serve in that capacity. A congregational meeting was eventually called, at which time Pastor Thornes was removed as pastor. Following petitions being filed by both pro-pastor and anti-pastor factions, the trial court entered an order finding, among other things, that, although the congregational meeting at which Thornes was removed as pastor was " 'regularly petitioned,' " the meeting was not conducted in " 'such a manner that the business of the congregation of the complainant was adequately or lucidly transacted, and any purported results of that meeting [were] null and void.' " 279 Ala. at 396, 186 So.2d at 105. The trial court further determined that Pastor Thornes was legally entitled to serve as pastor of the church and to occupy the pulpit upon the condition that Pastor Thornes call a subsequent congregational meeting for the purpose of allowing the congregation to vote on his retention or dismissal.
Relying upon the decision in Barton, supra, this Court found no error on the part of the trial court in inquiring into whether proper notice of the congregational meeting, at which Pastor Thornes was removed from the pulpit, was given in accordance with church procedure and whether, once called, the meeting was properly conducted and the removal of Pastor Thornes was accomplished in accordance with church procedure. Although this Court determined that the trial court had the authority to inquire into whether proper church procedure was followed in removing Pastor Thornes, it also determined that the court was without the authority to grant to Pastor Thornes the right to occupy the church's pastorate upon the condition that he call a subsequent congregational meeting for the purpose of allowing the congregation to decide by a vote whether to retain him. This Court determined that the trial court lacked the jurisdiction to do that because it amounted to the court's taking over and *989 running the affairs of the church. Galilee Baptist Church, supra.
In Abyssinia Missionary Baptist Church v. Nixon, 340 So.2d 746 (Ala. 1976), several individuals claimed to have been wrongfully expelled from membership in their church and claimed that church moneys had been misappropriated by the church's pastor. The trial court dismissed the complaint on the grounds that the plaintiffs lacked standing and that it lacked the jurisdiction to consider the matter. In reversing the trial court's judgment, this Court stated:
"As is the case with all churches, the courts will not assume jurisdiction, in fact [have] none, to resolve disputes regarding their spiritual or ecclesiastical affairs. However, there is jurisdiction to resolve questions of civil or property rights. Williams v. Jones, 258 Ala. 59, 61 So.2d 101 (1952).
"This court takes cognizance of the well established case law of this State pertaining to the Baptist Church and the limited nature of this State's courts' jurisdiction over the business transacted within the Baptist Church.
"....
"[An] accurate reflection of present Alabama law on this subject is found in In re Galilee Baptist Church, 279 Ala. 393, 186 So.2d 102 (1966) ; also involving a dispute between two opposing factions, and the alleged expulsion of the pastor at a congregational meeting. This court demonstrated it is proper for the courts to inquire whether a congregational meeting, at which church business is to be transacted, was preceded by adequate notice to the full membership, and whether, once called, the meeting was conducted in an orderly manner and the expulsion was the act of the authority within the church having the power to order it.
"Once the court is presented with sufficient evidence regarding the regularity of the meeting, it will then generally refuse to inquire further as to the fruits of the meeting. As was stated in Galilee:
" 'Spiritualities are beyond the reach of temporal courts, and a pastor may be deposed by a majority of the members at a congregational meeting at any time, so far as the civil courts are concerned, subject only to inquiry by the courts as to whether the church, or its appointed tribunal has proceeded according to the law of church.'
"We recognize here there are civil, as opposed to ecclesiastical, rights which have cognizance in the courts. A determination of whether the fundamentals of due process have been observed can be made in the judicial arena."
Nixon, 340 So.2d at 748.
In Foster v. St. John's Baptist Church, Inc., 406 So.2d 389 (Ala. 1981), the church, through its board of deacons, filed a petition seeking a temporary restraining order and an injunction, alleging that, at the annual meeting of the church held pursuant to the duly adopted bylaws, its pastor, Reverend Foster, was removed as pastor by the affirmative vote of the majority of the members present. The church plaintiffs further alleged that Reverend Foster had refused to relinquish the pastorate, that he was promoting disturbances in the church, and that he had threatened to occupy the pulpit after his removal. Reverend Foster had a contract with the church that required him to render full-time services to the church and to receive 90 days' notice of dismissal. Following a hearing, the trial court found that Foster had been removed from the pastorate in accordance with church rules, enjoined him from attempting to occupy the pulpit, and ordered *990 him to vacate the church office and parsonage within four weeks.
Reverend Foster argued on appeal that the contract that existed between him and the church required 90 days' notice of dismissal. However, this Court expressly pretermitted deciding any matters pertaining to an alleged civil or property right possessed by Reverend Foster, stating that the sole question before the Court "pertain[ed] to the church's ecclesiastical right to remove the pastor." Foster, 406 So.2d at 392. This Court stated:
"We pretermit discussion of [the contract] aspect of the case because the narrow issue before us is whether or not the defendant was removed as pastor according to the law of the church. As was stated in Barton v. Fitzpatrick, 187 Ala. 273, 65 So. 390 at 392-3 (1914) :
" 'The pastor of a church in his pastoral office performs a spiritual function. Spiritualities are beyond the reach of the temporal courts. It follows that a church which has employed a pastor, though the employment be for a fixed term and at a fixed salary, may at any time, so far as the civil courts are concerned, depose him from his spiritual office, subject only to inquiry by the courts as to whether the church, or its appointed tribunal, has proceeded according to the law of the church; nor can the payment of his salary, though in arrear, be made a condition precedent to his deposition. And in the case of a church organized on the congregational plan the inquiry is limited to the determination whether in fact the church has acted as a congregation....' "
406 So.2d at 391. This Court determined that Reverend Foster was removed as the pastor of the church in accordance with the law of the church, and it affirmed the judgment of the trial court. Foster, supra.
The foregoing authorities demonstrate this Court's willingness to recognize subject-matter jurisdiction in a trial court to determine whether church procedure or law has been followed when a church decides an ecclesiastical matter such as the removal of a pastor from the pulpit or the expulsion of members from the congregation. However, authorities to the contrary also exist.
In Hundley v. Collins, 131 Ala. 234, 32 So. 575 (1902), the petitioner, following a meeting of the congregation, was removed as a member and deacon of the Christian Church of Huntsville based on a disorderly conduct charge. The petitioner petitioned the trial court for a writ of mandamus, alleging that the church had improperly removed him as a member and deacon because he was not given notice of the meeting and the congregation had not actually voted on the charge of which he was accused. The trial court denied the petition; the petitioner appealed to this Court. This Court affirmed the judgment denying the petition, stating:
"There were no property interests involved, nothing touching what are termed the temporalities of the church, as contradistinguished from its spiritualities. The petitioner had no pecuniary interests, in any direction, involved in the proceeding, and it did not touch any of his civil rights at any point. It may be, the church proceeded irregularly according to common usage in such cases; but it is averred, that this church 'is of the denomination known as "Disciples of Christ," of which Alexander Campbell was the original preacher, if not the founder,' and that 'each church is of itself independent, not subject to the control of any higher or other ecclesiastical judicature.' As an ecclesiastical *991 body, therefore, it was a law unto itself, self-governing and amenable to no court, ecclesiastical or civil, in the discharge of its religious functions. It could make and unmake its rules and regulations for the reception and exclusion of members, and in reference to other matters; and what other body religious or civil could question its right to do so? Certainly, if it violated no civil law, the arm of civil authority was short to reach it. Admitting, therefore, as we must on demurrer, that petitioner had no notice of this proceeding, and that it was irregular according to common usage, the church being independent, and not subject to higher powers, and being a law unto itself for its own procedure in religious matters, what it did towards the expulsion of petitioner was not unlawful, even if it was not politic and wise. If the civil courts may in this instance interfere to question the exclusion of petitioner, they may do so, in any instance where a member of that or any other church is removed, on the allegations of irregular and unfair proceedings for the purpose. This would open a door to untold evils in the administration of church affairs, not consistent with the principles of religious freedom as recognized in this country, where there is no established church or religion, where every man is entitled to hold and express with freedom his own religious views and convictions, and where the separation of state and church is so deeply intrenched in our constitutions and laws.
"These views are in accord with the decisions of other States and of the Supreme Court of the United States."
Hundley, 131 Ala. at 242-43, 32 So. at 578. Accordingly, this Court held that the trial court had no jurisdiction of the matter, even where it was alleged that the petitioner's removal from the church was not in accordance with the church procedure.
In Putman v. Vath, 340 So.2d 26 (Ala. 1976), a priest refused to accept a reassignment ordered by the bishop at whose direction the priest was serving. The bishop then suspended the priest from the ministry and ordered him to vacate the rectory where he had been living. When the priest refused, the priest and the bishop reached an agreement whereby the priest would vacate the rectory immediately and the bishop would arrange for the proper canonical tribunal to hear the priest's grievances relative to his reassignment. When the bishop sought to convene the canonical tribunal he was informed by the Vatican that the matter of the reassignment was administrative and not judicial and that, therefore, under the canonical law of the Roman Catholic Church no tribunal could be established. The priest appealed this determination according to canonical law of the church, and the determination was upheld on appeal. The priest then sued the bishop seeking monetary damages and asking for a judgment declaring that the bishop could not deprive him of a benefice, office, or salary, and could not suspend him from the ministry.
The bishop challenged the trial court's jurisdiction to entertain the matter, arguing that the matter was one controlled by church law and not by the civil courts. The priest responded by arguing that the bishop's actions failed to satisfy the basic elements of due process because the priest had no opportunity to appear before a Vatican official with counsel, had no opportunity to present evidence, and had no opportunity to confront or cross-examine adverse witnesses. The trial court entered a summary judgment in favor of the bishop. Relying in part upon Hundley, supra, this Court affirmed the summary judgment on appeal, stating, in part:
"The facts in this matter leave no question in our minds that the dispute *992 between [the priest and the bishop] is an ecclesiastical one. Such disputes cannot be resolved in the courts of this state. Harris v. Cosby, 173 Ala. 81, 55 So. 231 (1911) ; Mt. Olive Primitive Baptist Church v. Patrick, 252 Ala. 672, 42 So.2d 617 (1949).
"The latter case involved a factional dispute within the church which resulted in two members being ousted from membership without notice. One of them was deposed from any official connection in the church and filed suit seeking reinstatement to the church office he had held. This court held that the civil courts would not intervene in the dispute, noting:
" 'We think the court would be treading on most dangerous ground and invading a sanctuary not set apart for its jurisdiction if it should permit dissident minorities, believing themselves to have been improperly excluded because of the procedure by which they were exscinded, to invoke its power to determine such a factional dispute. ...' 252 Ala. at 674, 42 So.2d at 619.
"Likewise, in Hundley v. Collins, 131 Ala. 234, 32 So. 575 (1901), this court affirmed the trial court in its refusal to entertain a suit whereby the plaintiff sought reinstatement to the Christian Church of Huntsville, from which the General Assembly of the church had suspended him without notice and a hearing. There, the court said:
" '... Admitting ... that petitioner had no notice of this proceeding, and that it was irregular according to common usage, the church being independent, and not subject to higher powers, and being a law unto itself for its own procedure in religious matters, what it did towards the expulsion of petitioner was not unlawful, even if it was not politic and wise. If the civil courts may in this instance interfere to question the exclusion of petitioner, they may do so, in any instance where a member of that or any other church is removed, on the allegation of irregular and unfair proceedings for the purpose. This would open a door to untold evils in the administration of church affairs, not consistent with the principles of religious freedom as recognized in this country, where there is no established church or religion, where every man is entitled to hold and express with freedom his own religious views and convictions, and where the separation of State and Church is so deeply entrenched in our constitutions and laws.' 131 Ala. at 243, 32 So. at 578."
Putman, 340 So.2d at 27-28.
In Lott v. Eastern Shore Christian Center, 908 So.2d 922 (Ala. 2005), a church member petitioned the trial court seeking an order requiring the church to make available its financial records for copying and inspection by the member. The member also sought a temporary restraining order ("TRO") prohibiting the church from taking disciplinary action against him, including expulsion from church membership, based on his request to inspect and copy church records. Following a hearing, the trial court entered an order permitting the member to copy and inspect the church records. However, the trial court denied the TRO stating that "this judge isn't going to get involved in the government of a church, because I don't think I have any jurisdiction over who is a member, or not a member, or what is contained in the constitution or the bylaws or anything of that nature." Lott, 908 So.2d at 925 (emphasis omitted). Meanwhile, on the same day the trial court denied the TRO, the church unanimously voted to rescind *993 the member's and his wife's membership in the church. The church then refused to allow the member to inspect and copy the church documents on the basis that he was no longer a member of the church.
Thereafter, the member filed two rule nisi motions in the trial court seeking an order requiring the church to show cause as to why it should not be held in contempt. The member argued that he had been refused access to the church records; that his membership in the church had been terminated in contravention of church bylaws; and that the trial court had jurisdiction over the matter to set aside the church's membership action based on a violation of his property interests and due-process rights. The trial court denied the motions for rule nisi.
On appeal, this Court noted that the trial court concluded that it had " 'no jurisdiction over the internal workings of a church group,' " 908 So.2d at 928, and stated that the issue was whether the trial court had exceeded its discretion in refusing to enjoin the church from expelling the church member after he had invoked his rights of inspection under § 10-3A-43, Ala. Code 1975. In affirming the trial court's refusal to enjoin the church based on its lack of subject-matter jurisdiction, this Court stated:
"Courts are constrained by the First Amendment of the United States Constitution from 'intrud[ing] into a religious organization's determination of ... ecclesiastical matters such as theological doctrine, church discipline, or the conformity of members to standards of faith and morality.' Singh v. Singh, 114 Cal.App.4th 1264, 1275, 9 Cal.Rptr.3d 4, 12 (2004) (emphasis added). 'Of course, [Alabama] courts concerned with restraints under the First Amendment applicable to the states through the Fourteenth [Amendment] are bound by the authoritative interpretations of the First Amendment enunciated by the United States Supreme Court.' 114 Cal.App.4th at 1280, 9 Cal.Rptr.3d at 16.
"To be sure, this Court has reviewed the actions of churches in expelling members or electing officers. See, e.g., Yates v. El Bethel Primitive Baptist Church, 847 So.2d 331 (Ala. 2002) ; Abyssinia Missionary Baptist Church v. Nixon, 340 So.2d 746 (Ala. 1976) ; In re Galilee Baptist Church, 279 Ala. 393, 186 So.2d 102 (1966). Jurisdiction was exercised in such cases, however, only insofar as 'to determine whether an election meeting of a church, or a similar meeting, was conducted so improperly as to render its results void.' Yates, 847 So.2d at 335-36 (the trial court properly invalidated an election of deacons, where the election meeting (1) was irregular in 'several material respects'; (2) was conducted to circumvent a prior, unappealed injunction; and (3) involved no 'issues of differences in religious faith,' 'creed,' or 'ecclesiastical doctrine'). See Nixon, supra (in an appeal from the grant of the pastor's motion to dismiss filed pursuant to Ala. R. Civ. P. 12(b), former church members, alleging that they had been improperly expelled, were entitled to 'present evidence' of invalidity or '[ir]regularity of the meeting' in which they were expelled); In re Galilee, supra (court's inquiry was limited to whether the meeting convened for the pastor's removal was so irregular as to void the results).
"....
"The mere threat of expulsion, which is all the TRO motion in this case involved, obviously did not involve an issue regarding a secular, or neutral, procedural defect. A challenge such as this one essentially alleges violation of a substantive right, such as a right to be free *994 from the arbitrary action of an ecclesiastical body. However, the United States Supreme Court has clearly stated that no such right exists. Serbian Eastern Orthodox Diocese for the United States of America & Canada v. Milivojevich, 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976).
"In Milivojevich, the Court considered whether the Illinois Supreme Court had properly invalidated the decision of the Holy Assembly of Bishops and the Holy Synod of the Serbian Orthodox Church ('the Mother Church') to 'defrock' Bishop Dionisije Milivojevich 'on the ground that [the decision] was "arbitrary" because a "detailed review of the evidence disclose[d] that the proceedings resulting in Bishop Dionisije's removal and defrockment were not in accordance with the prescribed procedure of the constitution and the penal code of the Serbian Orthodox Church." ' 426 U.S. at 718, 96 S.Ct. 2372. The Court held 'that the inquiries made by the Illinois Supreme Court into matters of ecclesiastical cognizance and polity and the court's action pursuant thereto contravened the First and Fourteenth Amendments.' 426 U.S. at 698, 96 S.Ct. 2372. In doing so, it explained:
" 'The conclusion of the Illinois Supreme Court that the decisions of the Mother Church were "arbitrary" was grounded upon an inquiry that persuaded the Illinois Supreme Court that the Mother Church had not followed its own laws and procedures in arriving at those decisions. We have concluded that whether or not there is room for "marginal civil court review" under the narrow rubrics of "fraud" or "collusion" when church tribunals act in bad faith for secular purposes, no "arbitrariness" exception in the sense of an inquiry whether the decisions of the highest ecclesiastical tribunal of a hierarchical church complied with church laws and regulations is consistent with the constitutional mandate that civil courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law. For civil courts to analyze whether the ecclesiastical actions of a church judicatory are in that sense "arbitrary" must inherently entail inquiry into the procedures that canon or ecclesiastical law supposedly requires the church judicatory to follow, or else into the substantive criteria by which they are supposedly to decide the ecclesiastical question. But this is exactly the inquiry that the First Amendment prohibits; recognition of such an exception would undermine the general rule that religious controversies are not the proper subject of civil court inquiry, and that a civil court must accept the ecclesiastical decisions of church tribunals as it finds them....
" ' "...."
" 'Indeed, it is the essence of religious faith that ecclesiastical decisions are reached and are to be accepted as matters of faith whether or not rational or measurable by objective criteria. Constitutional concepts of due process, involving secular notions of "fundamental fairness" or impermissible objectives, are therefore hardly relevant to such matters of ecclesiastical cognizance.'
" 426 U.S. at 712-16, 96 S.Ct. 2372 (emphasis added; footnotes omitted). See also Kaufmann v. Sheehan, 707 F.2d 355 (8th Cir. 1983) ; Green v. United Pentecostal Church Int'l, 899 S.W.2d 28 (Tex. Ct. App. 1995).
*995 " Milivojevich involved the discipline of a bishop, rather than a church member such as Lott. Nevertheless, '[f]or essentially the same reasons that courts have refused to interfere with the basic ecclesiastical decision of choosing the minister ..., this Court must not interfere with the fundamental ecclesiastical concern of determining who is and who is not [a Church] member.' Burgess v. Rock Creek Baptist Church, 734 F.Supp. 30, 33 (D.D.C. 1990). See also Kral v. Sisters of the Third Order Regular of St. Francis, 746 F.2d 450 (8th Cir. 1984) ; Nunn v. Black, 506 F.Supp. 444, 448 (W.D. Va.) ('the fact that the local church may have departed arbitrarily from its established expulsion procedures in removing the plaintiffs is of no constitutional consequence, whether one appeals the First, Fifth, or Fourteenth Amendments'), aff'd, 661 F.2d 925 (4th Cir. 1981) ; Caples v. Nazareth Church of Hopewell Ass'n, 245 Ala. 656, 660, 18 So.2d 383, 386 (1944) (' "we have no power to revise or question ordinary acts of church membership, or of excision from membership" ').
"Lott's motion stated no grounds for a TRO, other than an allegedly intractable disagreement over 'rights of access [to] and copying [of] Church records.' In seeking to preempt church discipline on these grounds, the motion for a TRO essentially invited the court to become embroiled in the merits of a 'fundamental ecclesiastical concern' with which the courts must have nothing to do, namely, 'determining who is and who is not [a Church] member.' Burgess, 734 F.Supp. at 33. Lott has cited no case preempting ecclesiastical discipline as he urged the trial court to do, and we have found none. Because Lott failed to show a 'reasonable chance of success on the merits,' the trial court did not err in denying his motion for a TRO."
Lott, 908 So.2d at 928-31 (footnotes omitted). See also Ex parte Board of Trs./Dirs. &/or Deacons of Old Elam Baptist Church, 983 So.2d 1079, 1093 (Ala. 2007) (quoting heavily from Lott, supra, and holding that the trial court cannot inquire into or assess the substantive criteria upon which terminations of church memberships are based).
Justice Parker noted in his special concurrence in Ex parte Tatum, 185 So.3d 434 (Ala. 2015), that this Court's recognition of Serbian Eastern Orthodox Diocese for the United States of America & Canada v. Milivojevich, 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976), in Lott signaled a modification in those authorities recognizing the subject-matter jurisdiction of the trial court to determine whether church procedure or law had been followed in church proceedings in which a church decides an ecclesiastical matter. The holdings in Hundley, supra, Putman, supra, Milivojevich, supra, and Lott, supra, indicate that a trial court lacks subject-matter jurisdiction to determine whether church procedure or law had been followed in a church proceeding in which the church decided an ecclesiastical matter. Perhaps Justice Murdock stated the rule best, while a member of the Court of Civil Appeals, in his special concurrence in McGlathery v. Richardson, 944 So.2d 968, 975 (Ala. Civ. App. 2006) (Murdock, J., concurring specially):
"[I]t is the nature of the underlying dispute that determines whether a court has jurisdiction to consider matters of church procedure. As Hundley [v. Collins, 131 Ala. 234, 32 So. 575 (1902),] clearly articulates, if the substantive dispute is spiritual or ecclesiastical in nature, it is irrelevant to the civil court whether the church followed its own procedures, per se; the civil court has no jurisdiction to consider the matter. See also, e.g., *996 Caples v. Nazareth Church of Hopewell Ass'n, 245 Ala. 656, 18 So.2d 383 (1944). Accord Sale v. First Regular Baptist Church, 62 Iowa 26, 17 N.W. 143 (1883) ; and Evans v. Shiloh Baptist Church, 196 Md. 543, 77 A.2d 160 (1950)."
Here, the Ray plaintiffs sought a determination from the trial court that Taylor's removal as pastor of PMBC was valid and in accordance with the PMBC bylaws. The trial court concluded in its order that it had subject-matter jurisdiction to "recognize that a decision made by the majority of the members of [PMBC] to remove [Taylor] as the pastor was a valid decision." The trial court then proceeded to note that, although the PMBC bylaws "did provide for boards to be established and persons to be appointed to those positions to make decisions" regarding the merit of any charges levied against a pastor upon which dismissal is based, no such boards existed at the time of the August 28, 2012, meeting in which a purported majority of PMBC's members voted to dismiss Taylor. The trial court-recognizing that, "[i]n a Baptist church, the majority of the congregation is the highest adjudicatory body, unless the church bylaws provide otherwise" and that the "PMBC bylaws did not specifically state that the majority of the congregation would not be considered the highest adjudicatory body of the church"-determined the members who voted to remove Taylor as the pastor of PMBC on August 28, 2012, constituted a majority of the membership of PMBC. Thus, the trial court held that the meeting conducted on August 28, 2012, in which Taylor was removed as the pastor of PMBC was a valid meeting. The trial court then ordered that Taylor be removed as pastor of PMBC immediately and that leadership and/or control of the church be vested with the Ray plaintiffs.
As discussed above, the removal of Taylor as the pastor of PMBC was purely an ecclesiastical matter not involving a property right and the trial court lacked the jurisdiction to consider it. The determination of whether his removal was valid and in accordance with PMBC's bylaws necessarily required the trial court to delve into matters relating to PMBC's internal organization and its ecclesiastical or spiritual rule, custom, or law. Based on the decisions in Hundley, supra, Putman, supra, Milivojevich, supra, and Lott, supra, the trial court lacked the jurisdiction to make that inquiry. Accordingly, to the extent that the trial court determined that the removal of Taylor as the pastor of PMBC was valid and, to that end, ordered that his removal be effective immediately, the trial court lacked the subject-matter jurisdiction to make such a determination because the matter was purely ecclesiastical in nature.
Conclusion
Because we conclude that the trial court lacked the subject-matter jurisdiction to make a determination as to whether Taylor's dismissal as the pastor of PMBC was valid, we reverse the judgment entered in favor of the Ray plaintiffs upholding his dismissal and remand the cause to the trial court to enter an order dismissing the Ray plaintiffs' complaint.[7]
REVERSED AND REMANDED WITH DIRECTIONS.
Stuart, C.J., and Parker, Main, Wise, and Sellers, JJ., concur.
Murdock, J., concurs specially.
Shaw and Bryan, JJ., concur in the result.
MURDOCK, Justice (concurring specially).
*997 I concur in all aspects of the main opinion. I write separately to comment briefly on the issue of the trial court's authority to decide whether it had jurisdiction over the dispute before it.
Alabama law provides that "[a] court has jurisdiction to determine its own jurisdiction." Jefferson Cty. Comm'n v. Edwards, 32 So.3d 572, 583 (Ala. 2009). We do not say that a trial court has jurisdiction to decide its own jurisdiction only when it does have jurisdiction. Nor do we say that a trial court has jurisdiction only to make correct decisions regarding its own jurisdiction. A trial court either has the jurisdiction to decide or it does not. Our jurisprudence holds that it does.
Here, the trial court decided the issue of its own jurisdiction. It is true that it then turned to the substantive merits of the case before it, but, before doing so, it expressly took up and decided the issue whether it had jurisdiction over those merits.
As it happens, the trial court erred in its decision as to its own jurisdiction. It is that error and only that error-as to an issue over which the trial court had jurisdiction-that this Court addresses in its opinion today. Because the trial court had jurisdiction over that issue, its decision addressing that issue is not void for lack of jurisdiction. Likewise, because the trial court had jurisdiction over that issue, this Court has jurisdiction over the appeal of its judgment as to that issue and, accordingly, this Court's "reversal" of the trial court's judgment is appropriate. The alternative-"dismissing" this appeal-would imply that the only portion of the trial court's judgment that we address-its decision that it had jurisdiction-was void. I see no basis for such a conclusion. The trial court's decision as to its own jurisdiction was one made in error, not one beyond its jurisdiction to make.
SHAW, Justice (concurring in the result).
I concur in the result. I write specially to note the following.
I.
The appellate courts of this State have in recent years strived to explain the difference between a Rule 12(b)(6), Ala. R. Civ. P., motion to dismiss for failure to state a claim and a Rule 12(b)(1), Ala. R. Civ. P., motion to dismiss for lack of subject-matter jurisdiction:
"There is a significant difference between proposing that a trial court must summarily adjudicate a case in favor of a defendant because a plaintiff is not entitled to prevail on certain claims as a matter of law (see Rule 12(b)(6), Ala. R. Civ. P.) and proposing that a trial court cannot adjudicate a case because it lacks jurisdiction over the subject matter (see Rule 12(b)(1), Ala. R. Civ. P.)."
Hill v. Hill, 89 So.3d 116, 120 (Ala. Civ. App. 2010).
Unlike a Rule 12(b)(6) motion, a Rule 12(b)(1) motion is not converted to a motion for a summary judgment by the attachment of materials outside the pleadings: "Affidavits, depositions, answers to interrogatories and similar evidentiary matter may be presented on a motion under Rule 12. Such matter is freely considered on a motion attacking jurisdiction." Committee Comments on the 1973 Adoption of Rule 12. The attachment of matters outside the pleadings, if not excluded, converts only motions under *998 Rule 12(b)(6) and Rule 12(c), Ala. R. Civ. P., into motions for a summary judgment. Committee Comments on the 1973 Adoption of Rule 12 ("On a motion ... pursuant to Rule 12(b)(6), or a motion ... pursuant to Rule 12(c), if matter outside the pleadings is presented to and not excluded by the court, the motion is to be treated as one for summary judgment pursuant to Rule 56."). However, "[u]nlike a motion pursuant to subsection (6) of Rule 12(b), a motion under subsection (1) of that rule is a 'speaking' motion that may be supported or opposed by materials outside the complaint, i.e., '[e]videntiary matters may be freely submitted on a motion to dismiss that attacks jurisdiction.' " Hutchinson v. Miller, 962 So.2d 884, 886 n.2 (Ala. Civ. App. 2007) (quoting Williams v. Skysite Commc'ns Corp., 781 So.2d 241, 245 (Ala. Civ. App. 2000) ).
In reviewing a motion to dismiss under Rule 12(b)(1) for lack of subject-matter jurisdiction, this Court has noted the existence of two distinct standards, depending on the nature of the motion:
" 'A court ruling on a Rule 12(b)(1) motion to dismiss "may consider documents outside the pleadings to assure itself that it has jurisdiction." Al-Owhali [v. Ashcroft], 279 F.Supp.2d [13,] 21 [ (D.D.C. 2003) ] ; see also Haase v. Sessions, 835 F.2d 902, 906 (D.C. Cir. 1987) ("In 12(b)(1) proceedings, it has been long accepted that the judiciary may make appropriate inquiry beyond the pleadings to satisfy itself on [its] authority to entertain the case." (internal citations and quotation marks omitted)). The level of scrutiny with which the Court examines the allegations in the complaint that support a finding of jurisdiction, however, depends upon whether the motion to dismiss asserts a facial or factual challenge to the court's jurisdiction. See I.T. Consultants v. Pakistan, 351 F.3d 1184, 1188 (D.C. Cir. 2003).
" 'Facial challenges, such as motions to dismiss for lack of standing at the pleading stage, "attack[ ] the factual allegations of the complaint that are contained on the face of the complaint." Al-Owhali, 279 F.Supp.2d at 20 (internal quotation marks and citation omitted). "If a defendant mounts a 'facial' challenge to the legal sufficiency of the plaintiff's jurisdictional allegations, the court must accept as true the allegations in the complaint and consider the factual allegations of the complaint in the light most favorable to the non-moving party." Erby [v. United States,] 424 F.Supp.2d [180, 181 (D.D.C. 2006) ] ; see also I.T. Consultants, 351 F.3d at 1188. The court may look beyond the allegations contained in the complaint to decide a facial challenge, "as long as it still accepts the factual allegations in the complaint as true." Abu Ali [v. Gonzales,] 387 F.Supp.2d [16,] 18 (D.D.C. 2005) ]; see also Jerome Stevens Pharm., Inc. v. Food & Drug Admin., 402 F.3d 1249, 1253-54 (D.C. Cir. 2005) ("At the pleading stage .... [w]hile the district court may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction, the court must still accept all of the factual allegations in the complaint as true." (internal citations and quotation marks omitted)).
" 'Factual challenges, by contrast, are "addressed to the underlying facts contained in the complaint." Al-Owhali, 279 F.Supp.2d at 20. Where a defendant disputes the factual allegations in the complaint that form the basis for a court's subject matter jurisdiction, "the court may not deny *999 the motion to dismiss merely by assuming the truth of the facts alleged by the plaintiff and disputed by the defendant." Phoenix Consulting, Inc. v. Republic of Angola, 216 F.3d 36, 40 (D.C. Cir. 2000). Instead, a court deciding a Rule 12(b)(1) motion asserting a factual challenge "must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss." Id. In such situations, "the plaintiff's jurisdictional averments are entitled to no presumptive weight; the court must address the merits of the jurisdictional claim by resolving the factual disputes between the parties." Erby, 424 F.Supp.2d at 181 (internal quotations omitted); see also Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. [1977] ) (holding that a court ruling on a factual challenge to its jurisdiction is not required to accept the plaintiff's factual allegations as true, but rather "is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case ... and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims").'
" Lindsey v. United States, 448 F.Supp.2d 37, 42-43 (D.D.C. 2006). Thus, a Rule 12(b)(1) motion can allege either a facial challenge, in which the court accepts as true the allegations on the face of the complaint, or a factual challenge, which requires consideration of evidence beyond the face of the complaint."
Ex parte Safeway Ins. Co. of Alabama, 990 So.2d 344, 349-50 (Ala. 2008). An appellate court reviews the trial court's application of these standards and resulting judgment "de novo," that is to say, with no presumption of correctness. See Hill, 89 So.3d at 117-18.
II.
Although I agree with the substantive analysis in the main opinion concluding that the trial court lacked subject-matter jurisdiction, I have concerns regarding whether the ultimate disposition of this appeal should be a dismissal instead of a reversal.
Generally, when a trial court lacks subject-matter jurisdiction, then all orders and judgments, except for a dismissal for lack of jurisdiction, are void "ab initio." Attenta, Inc. v. Calhoun, 97 So.3d 140, 146 (Ala. 2012) ("It is well settled that if the trial court lacks subject-matter jurisdiction over an action, then all orders and judgments in that action-except an order dismissing the case-are void ab initio."), Bernals, Inc. v. Kessler-Greystone, LLC, 70 So.3d 315, 319 (Ala. 2011) ("When a circuit court lacks subject-matter jurisdiction, all orders and judgments entered in the case, except an order of dismissal, are void ab initio."). "Ab initio" means "[f]rom the beginning; from the first act; from the inception." Black's Law Dictionary 6 (6th ed. 1990).
Because the trial court in the instant case lacked jurisdiction over the subject matter, its decision was void from the beginning. A void judgment cannot support an appeal: " 'A judgment entered by a court lacking subject-matter jurisdiction is absolutely void and will not support an appeal ....' " MPQ, Inc. v. Birmingham Realty Co., 78 So.3d 391, 394 (Ala. 2011) (quoting Vann v. Cook, 989 So.2d 556, 559 (Ala. Civ. App. 2008) ). In such cases, " 'an appellate court must dismiss an attempted appeal from such a void judgment.' " Id. It would thus appear to me that the main opinion, by holding (correctly, in my mind) that the trial court lacked subject-matter *1000 jurisdiction, recognizes that the trial court's decision was void ab initio. In such a case, the trial court's decision would not support an appeal, and a dismissal is required.
On the other hand, a court has jurisdiction to determine whether it has jurisdiction. Jefferson Cty. Comm'n v. Edwards, 32 So.3d 572, 583 (Ala. 2009) ("A court has jurisdiction to determine its own jurisdiction."). When a court determines that it does not have jurisdiction, it has the power to order the case dismissed. Attenta and Bernals, supra. If a court erroneously rules that it does have jurisdiction, as in this case, the question arises whether it had jurisdiction to do so if this Court later holds that it had no jurisdiction in the first place. However, it is not necessary for me to resolve this issue: The result of the main opinion is that the trial court must dismiss the complaint. I concur in that result.

Those minutes were not generated from the actual August 28, 2012, meeting, but are minutes generated from a subsequent special meeting held on September 12, 2012, describing the official action taken at the August 28, 2012, meeting.

In contrast to the minutes contained in the record and discussed above in note 1, supra, the Ray plaintiffs alleged in their complaint that eight members of PMBC voted to remove Taylor as pastor at the August 28, 2012, and that the membership status of one of those eight members was questioned.

The record does not contain a transcript of this hearing.

Because we treat this motion as one for dismissal pursuant to Rule 12(b)(1), Ala. R. Civ. P., we pretermit any discussion as to whether the motion in this case was converted to one for a summary judgment. See Ex parte Price, [Ms. 1151041, April 14, 2017] --- So.3d ----, ---- (Ala. 2017).

In an appropriate case, a trial court may properly consider matters outside the pleadings in deciding a challenge to subject-matter jurisdiction. See generally Ex parte Safeway Ins. Co. of Alabama, Inc., 990 So.2d 344, 349-50 (Ala. 2008). In the unusual case in which it becomes necessary for the trial court to receive evidence of such matters through ore tenus testimony, the de novo standard of appellate review presumably would, to that extent, yield to the ore tenus standard. No such case is presented here.

As set forth above, the Ray plaintiffs asserted that the Taylor defendants had appropriated church property and sought its return through injunctive relief. In Yates v. El Bethel Primitive Baptist Church, 847 So.2d 331 (Ala. 2002), this Court stated:
" '[T]he civil courts of this state have taken jurisdiction of disputes between factions of Baptist churches or of churches similarly governed on the ground that property or civil rights were involved.' This case began as one involving the finances, financial assets, and business of the Church, not any of its purely ecclesiastical or spiritual features, and those financial and business aspects of the Church have remained center stage throughout."
847 So.2d at 336 (quoting Williams, 258 Ala. at 62, 61 So.2d at 104 ). The trial court did not address the claim for injunctive relief in its order because that claim related to an alleged misappropriation of church property. The Ray plaintiffs have not raised the claim in a postjudgment motion, nor have they presented argument in support of the claim on appeal. Claims not argued on appeal are considered abandoned. Messer v. Turner, 932 So.2d 104 (Ala. Civ. App. 2005). Accordingly, we will not consider the Ray plaintiffs' claim seeking injunctive relief for an alleged misappropriation of church funds as a "property-rights" basis for the trial court's jurisdiction in this case.

Because we conclude that the trial court lacked the subject-matter jurisdiction to make a determination as to whether Taylor's dismissal as the pastor of PMBC was valid, we pretermit discussion of the issue raised by the Taylor defendants as to whether the five members who voted in favor of Taylor's dismissal actually constituted a majority of the congregation of PMBC.