Rel: April 12, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2023-2024

_____

### SC-2023-0385

_____

**Ex parte The Alabama-West Florida Conference of the United Methodist Church, Inc., and the General Council on Finance and Administration of the United Methodist Church**

**PETITION FOR WRIT OF MANDAMUS**

**(In re: Harvest Church-Dothan**

**v.**

**The Alabama-West Florida Conference of the United Methodist Church, Inc., and the General Council on Finance & Administration of the United Methodist Church d/b/a The United Methodist Church)**

**(Houston Circuit Court: CV-22-86)**

COOK, Justice.

This case involves a dispute over church property. Harvest Church-Dothan ("Harvest") is, or was at one time, a member church of the Alabama-West Florida Conference of the United Methodist Church, Inc. ("the AWFC"). Harvest brought this action against the AWFC and the "General Council on Finance and Administration of the United Methodist Church d/b/a The United Methodist Church" ("the GCFA") in the Houston Circuit Court.

Harvest sought a judgment declaring that the AWFC and the GCFA lack any legally cognizable interest in real or personal property held by Harvest ("the local church property") as well as injunctive relief preventing the AWFC and the GCFA from interfering with Harvest's use, ownership, or control of the local church property.

The AWFC and the GCFA moved to dismiss the action, arguing, among other things, that the trial court lacked subject-matter jurisdiction based on the ecclesiastical abstention doctrine, which is grounded in the Establishment Clause and the Free Exercise Clause of the First Amendment to the United States Constitution. That doctrine

prohibits civil courts from adjudicating disputes concerning spiritual or ecclesiastical matters. The AWFC and the GCFA additionally argued that the GCFA was an improper party to the action and that the trial court lacked personal jurisdiction over it. The trial court denied the motion to dismiss. The AWFC and the GCFA now petition this Court for a writ of mandamus directing the trial court to dismiss the underlying action.

"A petitioner carries a heavy burden in securing mandamus relief." Ex parte Gray, 308 So. 3d 4, 10 (Ala. 2020). After careful review, and for the reasons explained below, we conclude that the AWFC and the GCFA have not met their burden of demonstrating a clear legal right to have the complaint against them dismissed. Accordingly, we deny the petition. In doing so, we express no view on the merits of Harvest's action. Instead, this action will continue in the trial court for further proceedings.

## Facts and Procedural History

Since its founding in 1996, Harvest has been a member of the AWFC. The AWFC is a regional body of the United Methodist Church ("the UMC") and has certain supervisory responsibilities over member churches within its region. The governing instrument of the UMC is its

3

Book of Discipline.

Initially, Harvest held public services at a Dothan middle school. Harvest, however, soon began searching for land on which it could construct a new church building, and it sought financial support from the AWFC.

In 1999, Harvest identified a suitable parcel of land for the building site ("the land") and took steps to acquire the land. Although the full extent of the AWFC's financial contributions to Harvest's purchase and development of the land is unclear, it is undisputed that Harvest received an initial grant of approximately $25,000 from the AWFC for the land purchase.

On June 30, 1999, legal title to the land was conveyed by deed to three named individuals described as the "Trustees of Harvest United Methodist Church." (Emphasis added.)

Paragraph 2501 of the Book of Discipline provides that "[a]ll properties of United Methodist local churches … are held, in trust, for the benefit of the entire denomination, and ownership and usage of church property is subject to the Discipline." (Emphasis added.) Paragraph 2503.1 of the Book of Discipline specifically requires that

every deed of property to a local church include the following trust clause:

> "In trust, that said premises shall be used, kept, and maintained as a place of divine worship of the United Methodist ministry and members of The United Methodist Church; subject to the Discipline, usage, and ministerial appointments of said Church as from time to time authorized and declared by the General Conference and by the annual conference within whose bounds the said premises are situated. This provision is solely for the benefit of the grantee, and the grantor reserves no right or interest in said premises."

(Emphasis omitted.)

The deed at issue in this case included no such clause. However, Paragraph 2503.6 of the Book of Discipline further provides that the absence of a trust clause in a deed does not absolve a local church of "the responsibility to hold all of its property in trust for The United Methodist Church" if the deed conveys property to "a local church or church agency (or the board of trustees of either) of The United Methodist Church or any predecessor to The United Methodist Church."[1]

---

[1]Harvest does not dispute that it was a member of the AWFC and the UMC at the time the land was conveyed to the "Trustees of Harvest United Methodist Church." Harvest, however, does argue that it "has never agreed to accept the UMC trust clause, never executed any trust instrument, and never agreed to be bound by the UMC's administrative manual." Answer at p. 3. Further, Harvest argues that, since 2008, it has repeatedly informed the AWFC that the deed to the land does not contain the trust clause required by the Book of Discipline. Harvest additionally

5

Notably, paragraph 2506.1 of the Book of Discipline states, in relevant part, that "[a]ll provisions of the <u>Discipline</u> relating to property, both real and personal, and relating to the formation and operation of any corporation, and relating to mergers are <u>conditioned upon their being in conformity with the local laws</u>, and in the event of conflict therewith <u>the local laws shall prevail</u> …." (Emphasis added.)

Construction of a new church building on the land began sometime in 2002. On September 21, 2003, the new church building was consecrated in the name of "Harvest Church United Methodist" at a service presided over by the AWFC bishop and district superintendent.

In 2004, Harvest incorporated as a nonprofit corporation under the former Alabama Nonprofit Corporation Act, former § 10-3A-1 et seq., Ala. Code 1975, which has been recodified as the Alabama Nonprofit Corporation Law, § 10A-3-1.01 et seq., Ala. Code 1975. Paragraph 2506.2 of the Book of Discipline requires local churches to include the following in their corporate documents:

> "a) identification of the sponsoring church agency or agencies ('sponsor(s)') to which it relates and the relationship of the corporation to its sponsor(s),

---

contends that there is no such thing as an "implied trust" under Alabama law -- outside of a constructive trust created as an equitable remedy.

6

"b) recognition that its corporate powers are subject to the Discipline to the same extent as its sponsor(s), and

"c) recognition that the corporation's powers cannot exceed those given by the Discipline to its sponsor(s)."

Paragraph 2506.3 further requires that the corporate documents of the local church "include a reference to the [trust] provisions of ¶ 2501." Harvest's articles of incorporation did not satisfy the above-mentioned requirements. Instead, Harvest's articles of incorporation stated that "[t]he Church sitting and acting in a duly called and held business meeting shall be the final authority in all of its affairs," and that "title of all property shall be vested in the name of the Church."

In 2019, after years of disagreement over issues of human sexuality, the UMC's General Conference -- the UMC's supreme legislative body -- held a special session and passed a plan for congregations that wished to leave the UMC for "reasons of conscience" regarding the issues of human sexuality. The UMC's General Conference added paragraph 2553 to the Book of Discipline, which provided a "gracious exit" for congregations that wished to disaffiliate from the UMC over issues related to human sexuality. Specifically, paragraph 2553 allowed congregations to exit with property if the disaffiliating congregations met certain financial and

7

procedural obligations.[2]

On November 10, 2022, Harvest sued the AWFC and the GCFA in the trial court. In its complaint, Harvest acknowledged the possibility that Harvest's congregation "may or may not vote to cease its affiliation with the UMC denomination in the near future." Harvest further explained that, before its congregation made its decision, it wanted a judicial declaration that "it alone owns and controls all real and personal property titled in the name of, or held by, [Harvest]."

More specifically, the complaint asserted a claim requesting the following:

> "A declaration recognizing that [Harvest] alone is the absolute, full, exclusive, fee simple owner of all real or personal property that is owned by [Harvest], held for [Harvest], or titled in its name; further, that the UMC and the [AWFC] have no right to or interest in any of the real or personal property so owned by [Harvest]; and further, that neither the UMC nor the [AWFC] has any trust, equitable, or beneficial interest in any of the real or personal property so owned by [Harvest]. [Harvest] requests that the judgment be accompanied by permanent injunctive relief protecting and enforcing the declaratory judgment of the [the trial court]."

The complaint also sought a temporary restraining order ("TRO") and a

---

[2]Paragraph 2553 of the Book of Discipline expired on December 31, 2023.

preliminary injunction "prohibiting the UMC or the [AWFC] from taking any action that would directly or indirectly interfere with [Harvest's] use, ownership, or control of [the local church] property." Finally, the complaint sought

> "[a]ll other general and equitable relief to which [Harvest] may be entitled, including a judgment that, in the event of any determination that the UMC has any interest in the Land, that [Harvest] is entitled to compensation and/or an unjust enrichment award for the improvements made to the Land at [Harvest's] expense."

Harvest's action was subsequently stayed by agreement of the parties pending the outcome of Harvest's congregation's vote to sever its affiliation with the UMC.

In January 2023, Harvest's congregation voted overwhelmingly to cease its affiliation with the UMC. Harvest, however, acknowledged that the vote was not in accordance with paragraph 2553 of the Book of Discipline and that its disaffiliation is not consistent with the disaffiliation process required by the AWFC and the UMC.[3]

---

[3]In relevant part, the agreed stay order provided as follows:

"If within 120 days [Harvest] votes to sever its affiliation with the UMC and [the AWFC], and such disaffiliation is not consistent with the disaffiliation process required by the AWFC and [the] UMC, [Harvest] shall thereafter have seven

In February 2023, the AWFC and the GCFA moved to dismiss Harvest's complaint pursuant to Rules 12(b)(1), 12(b)(2), and 12(b)(6), Ala. R. Civ. P., primarily arguing that the trial court lacked subject-matter jurisdiction over the action based on the ecclesiastical abstention doctrine, which prohibits civil courts from adjudicating disputes concerning spiritual or ecclesiastical matters. The AWFC and the GCFA additionally argued that the GCFA was an improper party to the action and that the trial court lacked personal jurisdiction over it. After the trial court denied their motion to dismiss, the AWFC and the GCFA petitioned this Court for a writ of mandamus, and we ordered answers and briefs.

## Standard of Review

Matters of subject-matter jurisdiction are reviewed de novo. DuBose v. Weaver, 68 So. 3d 814, 821 (Ala. 2011). Ex parte Chandler, 910 So. 2d 763, 765 (Ala. 2005). A court ruling on a Rule 12(b)(1), Ala. R. Civ. P., motion to dismiss "'"may consider documents outside the pleadings

---

days to request that its pending TRO application be reset for hearing."

The materials before this Court do not indicate whether Harvest requested that its TRO application be reset for a hearing within the seven-day period specified above.

10

to assure itself that it has jurisdiction."'"Ex parte Safeway Ins. Co. of Alabama, Inc., 990 So. 2d 344, 349 (Ala. 2008) (quoting Lindsey v. United States, 448 F. Supp. 2d 37, 43 (D.D.C. 2006), quoting in turn Al-Owhali v. Ashcroft, 279 F. Supp. 2d 13, 21 (D.D.C. 2003)). "The question of subject-matter jurisdiction is reviewable by a petition for a writ of mandamus." Ex parte Liberty Nat'l Life Ins. Co., 888 So. 2d 478, 480 (Ala. 2003).

Further, "[a] petition for a writ of mandamus is the proper vehicle by which to challenge the denial of a motion to dismiss for lack of personal jurisdiction." Ex parte Merches, 151 So. 3d 1075, 1078 (Ala. 2014) (citing Ex parte Dill, Dill, Carr, Stonbraker & Hutchings, P.C., 866 So. 2d 519, 525 (Ala. 2003)). Our review of a trial court's ruling on a motion to dismiss for lack of personal jurisdiction is de novo. Ex parte Lagrone, 839 So.2d 620, 623 (Ala. 2002).

In reviewing a mandamus petition, this Court considers "'only those facts before the trial court.'" Ex parte Ford Motor Credit Co., 772 So. 2d 437, 442 (Ala. 2000) (quoting Ex parte Baker, 459 So. 2d 873, 876 (Ala. 1984)). Moreover, a petitioner must meet the exacting standard required for mandamus relief:

11

"Mandamus is a drastic and extraordinary writ, to be issued only where there is (1) a clear legal right in the petitioner to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) properly invoked jurisdiction of the court."

Ex parte Integon Corp., 672 So. 2d 497, 499 (Ala. 1995). Thus, on a mandamus petition, "[t]he burden of establishing a clear legal right to the relief sought rests with the petitioner." Ex parte Metropolitan Prop. & Cas. Ins. Co., 974 So. 2d 967, 972 (Ala. 2007).

Discussion

In their mandamus petition, the AWFC and the GCFA raise two arguments challenging the trial court's order denying their motion to dismiss. First, they contend that the trial court should have concluded that the First Amendment barred the trial court's exercise of subject-matter jurisdiction over Harvest's action. Second, they argue that the trial court should have dismissed the claim against the GCFA for lack of personal jurisdiction. We address each argument in turn.

I. Subject-Matter Jurisdiction

The primary issue before this Court is whether the AWFC and the GCFA are entitled to a writ of mandamus directing the trial court to dismiss Harvest's action for lack of subject-matter jurisdiction.

12

Harvest argues that its "complaint presents a single, straightforward, secular legal question: whether [Harvest] has full control of [the local church] property or whether the [local church] property is instead subject to a valid trust in favor of a third party, the UMC." Answer at p. 11. It emphasizes that the recorded deed to the land is a legal instrument and that Alabama civil courts have jurisdiction to construe the meaning of that deed. Further, Harvest emphasizes that this Court has adopted the "neutral principles of law," not the "hierarchical deference," approach to adjudicating church-property disputes. According to Harvest,

> "[d]espite the [AWFC and the GCFA's] suggestion, there is no real debate about how Alabama courts resolve church property disputes. In fact, it has been nearly 50 years since an Alabama court resolved a church property dispute the way that the [AWFC and GCFA are] requesting (by declining jurisdiction, declaring the denomination the default winner, and kicking the local church out of court)."

Answer at p. 14.

Harvest insists that adjudicating the claim in this case will not require the trial court to resolve any religious questions. Harvest notes that "[n]owhere in [its] complaint is there any request that [Harvest] be allowed to 'leave' the UMC," Answer at p. 11, and it insists that the claim

13

presented in its complaint should be "considered separately from any threatened counterclaim or non-legal defense [the AWFC and the GCFA] may assert." Answer at p. 12. According to Harvest, its complaint involves an ordinary property dispute and requests ordinary relief, including a judicial declaration "recognizing that [Harvest] alone is the absolute, full, exclusive, fee simple owner of all real or personal property that is owned by [Harvest], held for [Harvest], or titled in its name." It further argues that any "trust" that may (or may not) have been created in favor of the AWFC or the GCFA would be a trust governed by Alabama law. Thus, Harvest urges that its claim should be analyzed using "neutral principles of law" and that the trial court can properly exercise subject-matter jurisdiction over this action.

In their petition, the AWFC and the GCFA strongly disagree and argue that the underlying dispute in this case really concerns whether Harvest can disaffiliate from the UMC without satisfying the disaffiliation requirements set forth in Paragraph 2553 of the Book of Discipline. According to them, to "decide the issues raised by Harvest," the trial court will be required to impermissibly interpret various ecclesiastical provisions of the Book of Discipline as well as "address

14

Harvest's improper attempt to disaffiliate from the UMC ...." Petition at p. 17.

The AWFC and the GCFA contend that the question of Harvest's disaffiliation from the UMC is an ecclesiastical issue within the exclusive jurisdiction of the ecclesiastical courts and that the "neutral principles of law" approach to resolving church-property disputes consequently does not apply in this case.

The AWFC and the GCFA further warn that, should the action proceed, they "could file counterclaims and assert defenses based on the Discipline and church doctrine." Petition at p. 29 (emphasis added). For instance, they suggest that the conduct of the parties and certain provisions of the Book of Discipline gave rise to a trust in favor of the AWFC. They further insist that the trial court will need to reference, or even interpret, provisions of the Book of Discipline to determine whether Harvest can disaffiliate without following paragraph 2553 of the Book of Discipline. For these reasons, the AWFC and the GCFA urge that "[i]t is ecclesiastical law, not state law, that created and governs the trust in this case" and contend that the First Amendment prohibits the trial court's exercise of subject-matter jurisdiction over Harvest's action.

15

Petition at p. 27.

At a general level, it is undisputed that the Establishment Clause and the Free Exercise Clause of the First Amendment prohibit civil courts from adjudicating ecclesiastical issues. See Taylor v. Paradise Missionary Baptist Church, 242 So. 3d 979, 986 (Ala. 2017); Murphy v. Green, 794 So. 2d 325, 330 (Ala. 2000). However, this Court has repeatedly "recognized the right and duty of civil courts to exercise jurisdiction to protect the temporalities of the church, such as where civil rights or rights of property are involved." Williams v. Jones, 258 Ala. 59, 61, 61 So. 2d 101, 102 (1952). Thus, it is undisputed that civil courts do have jurisdiction to resolve church-property disputes. See Abyssinia Missionary Baptist Church v. Nixon, 340 So. 2d 746, 748 (Ala. 1976) ("[T]here is jurisdiction to resolve questions of civil or property rights." (citing Williams)).

To determine whether the trial court's exercise of subject-matter jurisdiction is proper here, we must examine in detail the controlling law and then discuss whether, considering that law, the AWFC and the GCFA's arguments warrant mandamus relief in this case.

A. Evolution of Federal Constitutional Law: Neutral Principles v. Hierarchical Deference

Although states may adopt "'any one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters,'" Jones v. Wolf, 443 U.S. 595, 602 (1979) (quoting Maryland & Virginia Eldership of Churches of God v. Church of God at Sharpsburg, Inc., 396 U.S. 367, 368 (1970) (Brennan, J., concurring)), the United States Supreme Court has specifically recognized two constitutionally permissible approaches to adjudicating church-property disputes -- the "hierarchical deference" approach and the "neutral principles of law" approach.

Under the "hierarchical deference" approach enunciated in the United States Supreme Court's 1872 decision in Watson v. Jones, 80 U.S. (13 Wall.) 679, 727-28 (1872), civil courts must defer to the decision of the highest judicatory body of a hierarchical church in resolving property disputes between a local congregation and the denomination.[4] In the century that followed, the "hierarchical deference" approach was the

---

[4]Although Watson was decided without express reference to the First Amendment, the Supreme Court constitutionalized the principle set forth in Watson in Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am., 344 U.S. 94 (1952).

17

favored approach for resolving church-property disputes. See Jeffrey B. Hassler, A Multitude of Sins? Constitutional Standards for Legal Resolution of Church Property Disputes in a Time of Escalating Intradenominational Strife, 35 Pepp. L. Rev. 399, 410 (2008).

In 1979, however, the United States Supreme Court, in Jones v. Wolf, expressly approved of a second approach to adjudicating church-property disputes -- the "neutral principles of law" approach.[5] In Jones, the Supreme Court reviewed a case arising out of a property dispute between members of a local Presbyterian church in Georgia and the National Presbyterian Church. The Jones Court endorsed Georgia's "neutral principles of law" approach to resolving church-property disputes, noting that "[t]he primary advantages of the neutral-principles approach are that it is completely secular in operation, and yet flexible

_____

[5]The "neutral principles of law" approach was first mentioned approvingly by the United States Supreme Court in Presbyterian Church in United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church, 393 U.S. 440 (1969). In that case, the Supreme Court noted that "there are neutral principles of law, developed for use in all property disputes, which can be applied without 'establishing' churches to which property is awarded." 393 U.S. at 449. A year later, the Supreme Court upheld a Maryland court's application of the "neutral principles of law" approach to a church-property dispute. Maryland & Virginia Eldership of Churches of God v. Church of God at Sharpsburg, Inc., 396 U.S. 367 (1970).

enough to accommodate all forms of religious organization and polity." 443 U.S. at 603.

The United States Supreme Court explained that, under the "neutral principles of law" approach, civil courts examine "the language of the deeds, the terms of the local church charters, the state statutes governing the holding of church property, and the provisions in the constitution of the [denominational] church concerning the ownership and control of church property" to determine whether there is any basis for a trust in favor of the denominational church. Id. The Jones Court noted that the approach permits "civil court[s] to examine certain religious documents, such as a church constitution, for language of trust in favor of the [denominational] church" but cautioned that "civil court[s] must take special care to scrutinize the document in purely secular terms, and not to rely on religious precepts in determining whether the document indicates that the parties have intended to create a trust." 443 U.S. at 604.

According to the United States Supreme Court, however, if interpreting the property provisions of religious documents "would require the civil court to resolve a religious controversy, then the court

19

must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body." Id. (citing Serbian E. Orthodox Diocese for United States and Canada v. Milivojevich, 426 U.S. 696, 709 (1976)). Thus, under the "neutral principles of law" approach, if the church-property litigation turns on the resolution of a dispute over religious doctrine or practice, civil courts are prohibited from resolving the underlying religious controversy and must accept the decisions of the highest ecclesiastical tribunal of a hierarchical church as "binding on them, in their application to the religious issues of doctrine or polity before them." Serbian E. Orthodox Diocese, 426 U.S. at 709 (emphasis added).

Although the Jones Court commended the "neutral principles of law" approach, it made clear that states were free to "'adopt any one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith.'" Jones, 443 U.S. at 602 (quoting Maryland & Virginia Eldership of Churches of God, 396 U.S. at 368 (Brennan, J., concurring)).

### B. Alabama Adopts "Neutral Principles of Law" Approach and Adjudicates Church-Property Disputes

Following Jones, this Court, in Trinity Presbyterian Church of

20

Montgomery v. Tankersley, 374 So. 2d 861 (Ala. 1979), reaffirmed "the right of civil courts to decide disputes concerning church property," id. at 865, and expressly adopted the "neutral principles of law" approach to adjudicating church-property disputes. Id. at 866.

A few years after Tankersley, this Court addressed another church-property dispute, and again affirmed that Alabama civil courts have jurisdiction to resolve such disputes. Harris v. Apostolic Overcoming Holy Church of God, Inc., 457 So. 2d 385, 387 (Ala. 1984). This Court further stated that civil courts "must use 'neutral principles of law' in adjudicating church property cases, Tankersley, supra, at 866, and [that] proper subjects of consideration in this adjudication include the deeds, state statutes governing the holding of church property, the local church's charter, and the [denominational] church's constitution. Jones, supra." Id.; see also African Methodist Episcopal Zion Church in Am., Inc. v. Zion Hill Methodist Church, Inc., 534 So. 2d 224, 225 (Ala. 1988).

Over a decade later, in Haney's Chapel United Methodist Church v. United Methodist Church, 716 So. 2d 1156 (Ala. 1998) ("Haney's Chapel"), a plurality of this Court reiterated that "Alabama courts have adopted the 'neutral principles of law' approach … and will consider, in

21

purely secular terms, the language of the deeds, the charter of the local church, any applicable state statutes, and any relevant provisions contained in the discipline of the national church" in resolving church-property disputes. Id. at 1158; see also Murphy, 794 So. 2d at 330 ("[T]he courts still have jurisdiction to decide cases concerning questions of civil or property rights …. The issue of who holds title to church property … is not ecclesiastical in nature."); Central Alabama Conf. of the African Methodist Episcopal Zion Church in Am. v. Crum, 746 So. 2d 1013, 1015 (Ala. Civ. App. 1999) ("[T]he courts can resolve disputes concerning civil or property rights.").

In 2003, this Court reviewed two additional disputes over church property. See Ex parte Central Alabama Conf., African Methodist Episcopal Zion Church in Am., 860 So. 2d 865 (Ala. 2003); Ex parte African Methodist Episcopal Zion Church, 860 So. 2d 870 (Ala. 2003). In both of those cases, this Court stated that trial courts should "follow the 'neutral-principles-of-law' approach and examine the deeds, the Book of Discipline, and other extrinsic evidence" to resolve the disputes. Ex parte Central Alabama Conf., 860 So. 2d at 869; see Ex parte African Methodist Episcopal Zion Church, 860 So. 2d at 874.

Under this Court's well-established precedent, then, civil courts can properly exercise jurisdiction to adjudicate church-related disputes as long as those disputes can be resolved (1) based on "neutral principles of law" and (2) without resolving a religious controversy (that is, an issue of "'religious practice or doctrine'"). <u>Ex parte African Methodist Episcopal Zion Church</u>, 860 So. 2d at 872 (quoting <u>Crum</u>, 746 So. 2d at 1015) (emphasis added). However, the fact that a civil court must review "'<u>the language of the deeds, the charter of the local church, any applicable state statutes, and any relevant provisions in the discipline of the national church</u>'" does not transform a controversy over church property into a dispute over issues of "'religious practice or doctrine.'" <u>Id.</u> at 872-73 (quoting <u>Crum</u>, 746 So. 2d at 1015 (emphasis added); <u>see</u> <u>also</u> <u>Jones</u>, 443 U.S. at 604 (holding that the First Amendment permits a state to resolve church-property disputes by examining "certain religious documents, such as a church constitution, for language of trust in favor of the [denominational] church"); <u>Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church</u>, 393 U.S. 440, 449 (1969) ("Hull") ("Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church

23

property.").

For the reasons explained below, the AWFC and the GCFA have not shown that either of these two requirements for the proper exercise of subject-matter jurisdiction cannot be met in this case.

C. Whether This Dispute Is a Property Dispute

The argument advanced by the AWFC and the GCFA suffers from at least three foundational flaws. First, the AWFC and the GCFA's claim that this is a church dispute over ecclesiastical, rather than property, issues is premised on the erroneous assertion that "Harvest wants the [trial] court to create a new disaffiliation process just for Harvest contrary to church law." Petition at p. 16.

As we noted at the outset of this opinion, the AWFC and the GCFA bear a heavy burden as petitioners for the writ of mandamus. See Ex parte Gray, 308 So. 3d at 10. The AWFC and the GCFA's petition, however, contains only general and conclusory allegations that Harvest "is seeking a judicial declaration absolving [it] from violating church law," Petition at p. 9, and that Harvest has asked the trial court to "create a disaffiliation process for Harvest that is contrary to the Discipline." Petition at p. 29. The AWFC and the GCFA point to no evidence that

supports these assertions.

Importantly, the submissions to this Court undercut the AWFC and the GCFA's characterization of Harvest's claim. Harvest's complaint does not seek judicial review of the disaffiliation procedure set forth in the Book of Discipline or otherwise ask the trial court to judicially declare that Harvest's vote to sever its affiliation with the UMC was consistent with the Book of Discipline's requirements.[6] Indeed, the prayer for relief in Harvest's complaint makes no reference to disaffiliation, and there is no evidence that Harvest intends to seek to disaffiliate pursuant to Paragraph 2553 of the Book of Discipline.

Instead, the complaint asks that the trial court (1) to recognize that Harvest "alone is the absolute, full, exclusive, fee simple owner of all real or personal property that is owned by [Harvest], held for [Harvest], or titled in its name," (2) to declare that the UMC and the AWFC do not have "any trust, equitable, or beneficial interest in any of the real or personal property so owned by [Harvest]," and (3) to prohibit the AWFC

---

[6]In fact, the submissions before this Court reflect that Harvest expressly acknowledged that it did not conduct its congregational vote to leave the UMC in accordance with Paragraph 2553 of the Book of Discipline.

and the UMC from "taking any action that would directly or indirectly interfere with [Harvest's] use, ownership, or control" of the local church property.

Accordingly, Harvest's claim, on the face of the complaint, pertains solely to the ownership and control of the local church property -- an issue that civil courts generally can resolve by applying "neutral principles of law." See Haney's Chapel, 716 So. 2d at 1158 (plurality opinion) ("[W]e note that civil courts have general authority to resolve church property disputes.");[7] see also Murphy, 794 So. 2d at 330 ("The issue of who holds

_____

[7]We note that, at oral argument, counsel for the AWFC and the GCFA attempted to distinguish Haney's Chapel (which involved virtually identical facts) because it was a plurality decision. This Court in Haney's Chapel first recognized that "civil courts have general authority to resolve church property disputes" and that "Alabama courts have adopted the 'neutral principles of law' approach" to adjudicating church-property disputes. 716 So. 2d at 1158. Then, applying that approach, it reversed the trial court's judgment on the merits (that is, it reversed the trial court's judgment declaring the UMC to be the equitable owner of the local church property at issue in that case after concluding that the evidence in that case indicated that the grantors of the local church property had "intended to convey the property to the trustees of the local church and to exclude the involvement and control of the [UMC]"). Haney's Chapel, 716 So. 2d at 1160. Further, the reasoning in Haney's Chapel is completely consistent with our other caselaw discussed above. For these reasons, although the plurality decision in Haney's Chapel is not binding authority, it does offer strong persuasive authority for the trial court's exercise of subject-matter jurisdiction in this case.

26

title to church property is a civil matter and is not ecclesiastical in nature.").

Second, the AWFC and the GCFA's argument that the trial court lacks subject-matter jurisdiction over Harvest's action is premised on the unsubstantiated assertion that adjudicating Harvest's claim will force the trial court to impermissibly inquire into matters of ecclesiastical concern. According to the AWFC and the GCFA, even if Harvest's claim concerns a civil dispute over property ownership, the trial court nevertheless lacks jurisdiction over Harvest's property claim because, they say, that claim cannot be decided without "intrud[ing] into constitutionally dangerous ecclesiastical territory." Petition at p. 21. In their petition, the AWFC and the GCFA broadly allege that "Harvest's attempted disaffiliation will be a central issue in this dispute," Petition at p. 8, and that the trial court "will be required to interpret and apply multiple parts of the Discipline related to church polity, procedure, and governance …." Petition at p. 17.

Once again, however, the conclusory assertions in the AWFC and the GCFA's petition are insufficient to support their claim that the issues raised in Harvest's complaint cannot be resolved without impermissibly

deciding matters of religious doctrine and practice. The AWFC and the GCFA never actually explain <u>why</u> adjudicating Harvest's <u>property</u> claim under Alabama law would require the interpretation and application of any <u>ecclesiastical</u> provisions of the Book of Discipline or "deep examination into … issues involving an understanding of the disaffiliation rules, process, and procedures." Petition at p. 20. <u>See</u> <u>McRaney v. North Am. Mission Bd. of the S. Baptist Convention, Inc.</u>, 966 F.3d 346, 351 (5th Cir. 2020) (holding that church's objection that it "may have 'valid religious reason[s]' for its action" did not deprive the trial court of subject-matter jurisdiction and noting that, "[w]ere such a broad statement alone sufficient to warrant dismissal at this stage, … religious entities could effectively immunize themselves from judicial review of claims brought against them").

As discussed above, under the "neutral principles of law" approach, the trial court should consider, in purely secular terms, "the language of the deeds, the charter of the local church, any applicable state statutes, and any relevant provisions contained in the discipline of the national church" to resolve the current property dispute. <u>See</u> <u>Ex parte African Methodist Episcopal Zion Church</u>, 860 So. 2d at 872-73; <u>Ex parte Central</u>

28

Alabama Conf., 860 So. 2d at 869; Haney's Chapel, 716 So. 2d at 1158 (plurality opinion); Harris, 457 So. 2d at 387.

Although the "neutral principles of law" approach contemplates that "there may be cases where the deed, the corporate charter, or the constitution of the [denominational] church incorporates religious concepts in the provisions relating to the ownership of property," so that interpreting "the instruments of ownership would require the civil court to resolve a religious controversy," Jones, 443 U.S. at 604, the AWFC and the GCFA have not demonstrated (1) that, under Alabama law, the disaffiliation provisions of the Book of Discipline are relevant to Harvest's property claim or (2) that interpreting the language of the deed, the relevant property provisions of the Book of Discipline, or any other extrinsic evidence would require the trial court to impermissibly decide any religious issues. See Murphy, 794 So. 2d at 330 ("Because the resolution of these issues requires a court merely to review church records and incorporation documents, without delving into spiritual matters, there is no constitutional bar to a court's hearing this case.").

### D. Why the Cited Caselaw Does Not Support a Lack of Subject-Matter Jurisdiction

Finally, the AWFC and the GCFA cite no relevant authority for the

proposition that the "matters before the [trial court] are predominantly ecclesiastical in nature," Petition at p. 15, and their argument that the trial court lacks subject-matter jurisdiction over this action reflects a fundamental misunderstanding of our controlling precedents.

In their mandamus petition, the AWFC and the GCFA cite Our Lady of Guadalupe School v. Morrissey-Berru, 591 U.S. ___, 140 S. Ct. 2049 (2020), Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC, 565 U.S. 171 (2012), Serbian Eastern Orthodox Diocese for United States and Canada v. Milivojevich, 426 U.S. 696 (1976), Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America, 344 U.S. 94 (1952), and Watson v. Jones, 80 U.S. (13 Wall.) 679 (1872), for the broad proposition that the First Amendment insulates ecclesiastical issues from judicial review and protects religious institutions from state interference in matters of faith, doctrine, and church governance.

The AWFC and the GCFA, however, do not (1) explain why this general principle of law applies to the specific set of facts in this case or (2) discuss whether the foregoing cases involve an analogous set of circumstances. Crucially, the facts presently before this Court are readily distinguishable from those in the cases cited by the AWFC and the GCFA.

30

For instance, in <u>Serbian Eastern Orthodox Diocese for United States and Canada</u>, the issue of who controlled the property of the American-Canadian Diocese of the Serbian Eastern Orthodox Church hinged on whether the respondent was the true bishop of the American-Canadian Diocese.[8] The United States Supreme Court held that, because (1) "the sole power to appoint and remove Bishops of the [Serbian Eastern Orthodox] Church resides in its highest ranking organs," 426 U.S. at 715, and (2) the highest ecclesiastical authority of the Serbian Eastern Orthodox Church had removed the respondent as bishop of the American-Canadian Diocese, civil courts were required to accept the incidental effects of that ecclesiastical decision as binding on them. 426 U.S. at 720. Here, in contrast, the AWFC and the GCFA have not shown that, <u>under Alabama law</u>, resolving the property dispute in this case hinges on the resolution of any ecclesiastical decision or issue.

In their mandamus petition, the AWFC and the GCFA also cite <u>African Methodist Episcopal Zion Church in America, Inc. v. Zion Hill Methodist Church, Inc.</u>, 534 So. 2d 224 (Ala. 1988) ("<u>Zion Hill</u>"), and

---

[8]Under Illinois law, the bishop of the American-Canadian Diocese was the principal officer of the property-holding church corporations in that case. <u>Serbian E. Orthodox Diocese</u>, 426 U.S. at 709.

United Methodist Church v. St. Louis Crossing Independent Methodist Church, 150 Ind. App. 574, 276 N.E.2d 916 (1971) ("St. Louis Crossing"), for the narrower proposition that Harvest's property claim cannot be resolved based on "neutral principles of law." Neither case, however, concerns a civil court's subject-matter jurisdiction. In Zion Hill, a national religious denomination appealed from a judgment based on a jury's verdict finding that the local church, and not the national religious denomination, owned the church property at issue. 534 So. 2d at 224. Although this Court concluded that the jury's verdict in favor of the local church was contrary to the evidence, it did not hold that the trial court lacked subject-matter jurisdiction over the action or that the claim could not be analyzed using "neutral principles of law." Id. at 228. In fact, this Court expressly applied the "neutral principles of law" approach in concluding that the national religious denomination was the equitable owner of the church property in that case. Id. at 225. Similarly, in St. Louis Crossing, an Indiana state court expressly applied the "neutral principles of law" approach to determine that an implied trust applied to the property in question. See St. Louis Crossing, 150 Ind. App. at 585, 276 N.E.2d at 923 ("[I]t seems clear that substantial evidence exists

32

which, according to neutral principles of law, establishes that an implied trust in favor of the appellants was intended by the local church and that it was in fact established." (emphasis added)).

Further, by arguing that ecclesiastical, rather than civil, law governs whether a valid trust in favor of the UMC exists in this case, the AWFC and the GCFA have also misread -- and misapplied -- the many federal and Alabama decisions that have consistently held that civil courts must decide disputes concerning church property by "looking at so-called 'neutral principles of law' and not resolv[ing] the underlying controversies over religious doctrine." Tankersley, 374 So. 2d at 866 (citing Hull, 393 U.S. at 449); see also Jones, 443 U.S. at 602.

The AWFC and the GCFA have not cited a single Alabama case holding that the First Amendment bars a trial court from adjudicating a church-related dispute over real property by "consider[ing], in purely secular terms, the language of the deed[], the charter of the local church, any applicable state statutes, and any relevant provisions contained in the discipline of the national church." Haney's Chapel, 716 So. 2d at 1158

(plurality opinion).[9] Accordingly, the AWFC and the GCFA are not entitled to a writ of mandamus to compel the trial court to dismiss Harvest's action for lack of subject-matter jurisdiction.

## II. Personal Jurisdiction

---

[9]In their notice of supplemental authority, the AWFC and the GCFA additionally cite Oklahoma Annual Conference of the United Methodist Church, Inc. v. Timmons, 538 P.3d 163 (2023) ("Timmons I"), and Oklahoma Annual Conference of the United Methodist Church, Inc. v. Timmons, 538 P.3d 170 (2023) ("Timmons II"). These cases do not involve property claims and instead involve claims about how the actual disaffiliation process works. The AWFC and the GCFA do not explain how the facts in the foregoing cases are analogous to the facts in the present case. Significantly, the local churches in Timmons I and Timmons II both chose to disaffiliate pursuant to the procedure set forth in Paragraph 2553 of the Book of Discipline. When the local churches became dissatisfied with the UMC's administration of that procedure, they asked a trial court for injunctive relief directing the UMC to "call a special Annual Conference … to vote on whether to approve [the local church's] disaffiliation agreement," Timmons I, 538 P.3d at 167, and to allow the local church to "hold a church conference vote on disaffiliation before" a specified date. Timmons II, 538 P.3d at 174. The Oklahoma Supreme Court concluded that, by interpreting ecclesiastical provisions of the Book of Discipline and fashioning a remedy contrary to the ecclesiastical provisions in the Book of Discipline, the trial courts in Timmons I and Timmons II "exercised judicial power unauthorized by law." Timmons I, 538 P.3d at 170; see Timmons II, 538 P.3d at 176. Here, in contrast, Harvest has not sought to disaffiliate pursuant to Paragraph 2553 of the Book of Discipline and has not asked the trial court (1) to enjoin the UMC's administration of the disaffiliation process or (2) to force the UMC to ecclesiastically recognize its disaffiliation. Thus, Timmons I and Timmons II also do not stand for the proposition that the trial court lacks subject-matter jurisdiction over Harvest's property claim in this case.

In their mandamus petition, the AWFC and the GCFA additionally challenge the trial court's exercise of personal jurisdiction over the GCFA. The AWFC and the GCFA claim that Harvest, by naming the "General Council on Finance and Administration of the United Methodist Church d/b/a The United Methodist Church," has named an improper party as a defendant, warranting dismissal of Harvest's claim against the GCFA for lack of personal jurisdiction. According to them,

> "[b]ecause 'The United Methodist Church' is not an entity with legal capacity, no United Methodist entity, [the] GCFA included, can 'do business as' the UMC. Because Harvest cannot name the denomination, a nonjural entity, as defendant, it attempts to use [the] GCFA as a proxy. Harvest cites ¶2509 of the Discipline, but that section actually opposes this effort.
>
> > "'¶2509. Instituting and Defending Civil Action -- Because of the nature of The United Methodist Church (¶141), no individual or affiliated church body or unit, nor any official thereof, may commence or participate in any suit or proceeding in the name of or on behalf of The United Methodist Church, excepting, however, the following:
> >
> > "'1. The General Council on Finance and Administration or any person or church unit served with legal process in the name of The United Methodist Church may appear for the purpose of presenting to the court the nonjural nature of The United Methodist Church and to raise issues of lack of jurisdiction of the court, lack

35

of capacity of such individual or unit to be served with process, and related constitutional issues in defense of denominational interests.'

"[The] GCFA is not the UMC, and when served in the name of the UMC, [the] GCFA may only make appearance to explain the nonjural nature of the UMC. Any other action by [the] GCFA would be inconsistent with denominational polity."

Petition at pp. 31-32 (bold typeface omitted). The AWFC and the GCFA contend that the trial court lacks personal jurisdiction over the GCFA because, they say, pursuant to the foregoing provision of the Book of Discipline, the GCFA is prohibited from representing the UMC in these circumstances and is not, therefore, a proper defendant.[10]

In response, Harvest notes that although the GCFA "labels its objection as jurisdictional, [it] cites no authority relating to personal jurisdiction and does not contest its contacts with Alabama." Answer at p. 27. Harvest further explains that the GCFA is named as a defendant because the Book of Discipline's trust clause names the UMC, and not

_____

[10]To the extent that the AWFC and the GCFA intended to argue a legal doctrine other than personal jurisdiction to support their claim that the GCFA is "not a proper defendant," Petition at p. 33, they have failed to cite any relevant legal authority. And, they have also failed to provide any legal argument suggesting that this Court could address such an unnamed legal doctrine on mandamus review.

36

the AWFC, as the beneficiary of that trust. According to Harvest, pursuant to paragraph 807 of the Book of Discipline,[11] "the GCFA is not only the legal entity that is explicitly appointed as the UMC's agent to receive any assets conveyed to the 'the UMC' in trust, but it is also the entity charged with protecting the legal rights of the denomination." Answer at p. 28. Harvest therefore contends that the GCFA is indisputably a proper party.

Although the AWFC and the GCFA characterize their arguments as a challenge to the trial court's personal jurisdiction over the GCFA,

---

[11]In relevant part, paragraph 807.1 of the Book of Discipline provides as follows:

> "The [GCFA] shall have the following additional fiscal responsibilities:
>
> "1. To receive, collect, and hold in trust for the benefit of The United Methodist Church, its general funds, or its general agencies any and all donations, bequests, and devises of any kind, real or personal, that may be given, devised, bequeathed, or conveyed to The United Methodist Church as such …."

Additionally, paragraph 807.9 of the Book of Discipline further provides that the GCFA is charged with taking "all necessary legal steps to safeguard and protect the interests and rights of the denomination … and to make provisions for legal counsel where necessary to protect the interests and rights of the denomination."

37

their claim that the trial court lacks personal jurisdiction is not grounded in any allegations of insufficient minimum contacts or defective service of process.[12] The AWFC and the GCFA also cite no relevant authority for the proposition that the trial court should dismiss the claim against the GCFA for lack of personal jurisdiction. As previously noted, a petitioner for the writ of mandamus "carries a heavy burden in securing mandamus relief." Ex parte Gray, 308 So. 3d at 10. Here, the AWFC and the GCFA have not met their burden of demonstrating that the trial court's exercise of personal jurisdiction over the GCFA is improper.

Conclusion

For the reasons discussed above, we deny the AWFC and the GCFA's petition for the writ of mandamus.

PETITION DENIED.

Bryan and Mitchell, JJ., and McCool,* Special Justice, concur.

_____

[12]Rule 4.2(b), Ala. R. Civ. P., allows service of process

"outside of this state upon a person or entity in any action in this state when the person or entity has such contacts with this state that the prosecution of the action against the person or entity in this state is not inconsistent with the constitution of this state or the Constitution of the United States."

*Judge Chris McCool of the Alabama Court of Criminal Appeals and Judge Christy O. Edwards of the Alabama Court of Civil Appeals

Parker, C.J., concurs in part and concurs in the result, with opinion.

Sellers, J., concurs in the result, with opinion.

Edwards,* Special Justice, concurs in the result.

Shaw, Wise, Mendheim, and Stewart, JJ., recuse themselves.

---

were appointed on November 16, 2023, to serve as Special Justices in regard to this petition for a writ of mandamus.

PARKER, Chief Justice (concurring in part and concurring in the result).

I agree with the main opinion that the Alabama-West Florida Conference of the United Methodist Church, Inc. ("the AWFC"), and the General Council on Finance and Administration of the United Methodist Church ("the GCFA") ("the petitioners") have failed to demonstrate that they are entitled to have the underlying case dismissed for lack of subject-matter jurisdiction and to have the GCFA dismissed for lack of personal jurisdiction. As the main opinion explains, the precedents on the specific issue of church-property disputes cut against the petitioners. In particular, when a deed grants the property to the local church and not the hierarchical church, it appears to me that the appellate courts of this State have always sided with the local church. See, e.g., Haney's Chapel United Methodist Church v. United Methodist Church, 716 So. 2d 1156, 1160 (Ala. 1998) (plurality opinion); African Methodist Episcopal Church v. St. Paul Methodist Church of Selmont, 362 So. 2d 868, 874 (Ala. 1978); Central Alabama Conf. of the African Methodist Episcopal Zion Church in Am. v. Crum, 746 So. 2d 1013, 1017 (Ala. Civ. App. 1999). In this case, the deed clearly gives the property to the trustees of Harvest Church-Dothan ("Harvest"), not to the United Methodist Church ("the UMC").

Consequently, I agree that the petitioners have failed to demonstrate that they have a clear legal right to the relief sought.

All we had to do to resolve this case is examine whether, under our existing precedents, the petitioners had a clear legal right to have the case dismissed. Parts I.C., I.D., and II of the "Discussion" section of the main opinion accurately apply our precedents and answer that question in the negative. Because I believe those parts of the opinion are correct, I concur with them in full. The analysis could have and should have stopped there.

But in reaching this conclusion, the main opinion says much more than is necessary. In attempting to resolve our sometimes confusing jurisprudence concerning church disputes, the main opinion reasons that "civil courts can properly exercise jurisdiction to adjudicate church-related disputes as long as those disputes can be resolved (1) based on 'neutral principles of law' and (2) without resolving a religious controversy (that is, an issue of ' "religious practice or doctrine" ')." ___ So. 3d at ___. I find this test similar to the Lemon test, which "ambitiously attempted to find a grand unifying theory of the Establishment Clause, [while in later decisions the United States Supreme Court took] a more

41

modest approach that focuses on the particular issue at hand." <u>American Legion v. American Humanist Ass'n</u>, 588 U.S. 29, 60 (2019) (discussing the shortcomings of the test set forth in <u>Lemon v. Kurtzman</u>, 403 U.S. 602 (1971)). In the same way, I believe that the majority's test for determining whether we have jurisdiction in <u>every</u> church-dispute case is an ambitious attempt to find a grand unifying theory instead of focusing on the particular type of case at hand, which is what our more recent precedents have done.

While I believe that the main opinion accurately applies our precedents on the limited issue of church-property disputes, I believe that it goes too far in announcing a grand unifying theory applicable to all church-dispute cases that will unfortunately result in a loss of religious liberty. Furthermore, the main opinion implies that the basis for the limits on the jurisdiction of the courts is found only in the First Amendment to the United States Constitution, which I do not believe is accurate. Because I would have answered only the limited question presented to us, I cannot join the main opinion in full.

<u>I. The Procedural Posture of This Case</u>

The procedural posture of this case makes it an exceptionally bad candidate for overhauling our church-dispute jurisprudence. First, no party has asked us to depart from our precedents as they currently stand. Generally, this Court is "not inclined to abandon precedent without a specific invitation to do so." Clay Kilgore Constr., Inc. v. Buchalter/Grant, L.L.C., 949 So. 3d 893, 898 (Ala. 2006). Because our precedents concerning church-property disputes were a major obstacle for the petitioners in this case, they had a strong incentive to ask us to revisit them, but they did not do so. Overhauling our precedents ex mero motu, and therefore without the benefit of adversarial testing, is typically an extraordinary and often jurisprudentially detrimental move.

The main opinion's sweeping ambition is even more improper considering that we are addressing legal issues arising from a limited, interlocutory petition for a writ of mandamus, not a direct, full-throated appeal. Mandamus review "has essentially been limited to well recognized situations where there is a clear legal right in the petitioner to the order sought." Ex parte U.S. Bank Nat'l Ass'n, 148 So. 3d 1060, 1064 (Ala. 2014). If a petitioner fails to meet this burden, then he will not receive the relief sought. See Ex parte Alfa Mut. Ins. Co., 333 So. 3d 925,

43

926-27 (Ala. 2020). In this case, the main opinion correctly holds that petitioners have not met their burden and therefore refuses to give them the relief they seek. But if the petitioners did not even get the relief requested in <u>this case</u>, then why should we go even further and overhaul how we address <u>all</u> church-dispute cases?[13]

Because the main opinion discusses a matter not presented by the parties and not essential to the judgment, the grand unifying theory presented therein is, I believe, mere obiter dictum. <u>Ex parte Williams</u>, 838 So. 2d 1028, 1031 (Ala. 2002) ("obiter dictum is, by definition, not essential to the judgment of the court which states the dictum"). But as this Court's experience shows, dicta often creates unnecessary confusion. See <u>Diemert v. City of Mobile</u>, 474 So. 2d 663, 665 (Ala. 1985) ("this Court, in dicta, attempted to clear up this confusion, but unfortunately failed to do so"); see also <u>Ex parte Courtyard Citiflats, LLC</u>, 191 So. 3d 787, 797 (Ala. 2015) (Murdock, J., dissenting) (arguing that dicta from a previous decision "laid the groundwork for what I consider to be much confusion"); <u>Hughes Devs., Inc. v. Montgomery</u>, 903 So. 2d 94, 102-03 (Ala. 2004)

---

[13]I particularly regret that, in an opinion trying to do too much with our church-dispute jurisprudence, four of our Court's members are recused and unable to participate or provide insight and counsel.

(Houston, J., concurring specially) (admitting that dicta he wrote in a prior decision caused confusion).

## II. Restatement of Our Church-Dispute Jurisprudence

Since the main opinion has introduced a new grand unifying theory of church-dispute cases that is not supported by our precedents, I feel compelled to restate what we have actually held in these kinds of cases. In my view, there are three classes of church-dispute cases. The first involves purely ecclesiastical questions;[14] nobody disagrees that we have no jurisdiction over such cases. The second involves purely civil questions; nobody disagrees that we do have jurisdiction over such cases. But the third involves mixed questions, where the ecclesiastical and the civil questions are intertwined. In my view, most cases fall into the third category.

---

[14]Our decisions sometimes say "spiritual or ecclesiastical" questions; at other times, they lump both categories of questions together as simply "spiritual" questions. Compare Taylor v. Paradise Missionary Baptist Church, 242 So. 3d 979, 986 (Ala. 2017) (using the term "'spiritual or ecclesiastical affairs'") (citations omitted) with Murphy v. Green, 794 So. 2d 325, 330 (Ala. 2000) (using the term "spiritual matters"). For simplicity's sake, the term "ecclesiastical" in this special writing encompasses both "spiritual" and "ecclesiastical" unless otherwise noted.

Failing to recognize the third category of church-dispute cases can lead to an artificial binary, which produces overly simplistic analysis that inevitably leads to inconsistent results. For instance, a church's firing its pastor is an ecclesiastical matter, St. John Baptist Church, Inc. v. Howard, 211 So. 3d 804, 810 (Ala. 2016), except when it is a civil matter, In re Galilee Baptist Church, 279 Ala. 393, 397, 186 So. 2d 102, 107 (1966). A church's expelling members is an ecclesiastical matter, Lott v. Eastern Shore Christian Ctr., 908 So. 2d 922, 930-31 (Ala. 2005), except when it's a civil matter, Abyssinia Missionary Baptist Church v. Nixon, 340 So. 2d 746, 748 (Ala. 1976). Church procedure is an ecclesiastical matter, Taylor v. Paradise Missionary Baptist Church, 242 So. 3d 979, 995-96 (Ala. 2017), except when it is a civil matter, Yates v. El Bethel Primitive Baptist Church, 847 So. 2d 331, 346-47 (Ala. 2002). In nearly every case that this Court has addressed, one side has framed the issue as an ecclesiastical matter, while the other side has framed it as a civil matter. The parties in this case are no exception. See Petition at 15 ("The matters before the Court are predominantly ecclesiastical in nature and should be determined in accordance with the Discipline and church law."); Answer at 5 ("Despite the [petitioners'] position, the underlying

46

claim at issue is a pure property dispute and not an 'ecclesiastical' matter.").

If we are left with only the ecclesiastical/civil dichotomy to decide these cases, then success may turn not on the merits of the case, but on which lawyer was better at framing the issue. Such an approach cannot do justice to religious freedom. Churches are entitled to know "before they act the standard to which they will be held, rather than be compelled to guess about the outcome of Supreme Court peek-a-boo." United States v. Virginia, 518 U.S. 515, 574 (1996) (Scalia, J., dissenting).

In recent years, both this Court and the United States Supreme Court have moved away from classifying church-dispute matters as purely civil disputes, taking a more refined approach to understand them as ecclesiastical or at least mixed. See, e.g., Taylor, 242 So. 3d at 995 (holding that recent precedents from the United States Supreme Court and the Alabama Supreme Court "signaled a modification in those authorities recognizing the subject-matter jurisdiction of the trial court to determine whether church procedure or law had been followed in church proceedings in which a church decides an ecclesiastical matter"). Lott, 908 So. 2d at 930-31 (holding that an "allegedly intractable

47

disagreement over 'rights of access [to] and copying [of] Church records'" was insufficient to involve a court in the "'fundamental ecclesiastical concern'" of "'determining who is and who is not a church member'") (citation omitted)). As the portion of <u>Taylor</u> quoted above demonstrates, our jurisprudence has been shifting indeed. Consequently, we must carefully examine the boundaries of our jurisdiction, noting that our trend has been to more closely consider the true nature of the church disputes that come before us, and often discerning them to be ecclesiastical rather than civil when they are intertwined.[15]

Having reviewed the arc of this Court's and the United States Supreme Court's church-dispute precedents, I offer a summary restatement of such jurisprudence to better divide that which belongs to the church and that which belongs to the civil government.

---

[15]Continuing with the analogy to developments in the United States Supreme Court's Establishment Clause precedents, the Supreme Court moved from the <u>Lemon</u> test to an issue-by-issue test (<u>American Legion</u>) to the history test (<u>Kennedy v. Bremerton Sch. Dist.</u>, 597 U.S. 507, 535-36 (2022)). In the same way, if Alabama's church-dispute jurisprudence is moving toward a cardinal rule that sets the stage for most church-dispute cases, I believe it is moving toward considering the true nature of the dispute and holding that we have no jurisdiction if it is ecclesiastical. See <u>infra</u> (listing the three classes of cases and providing citations).

First, the following matters are left completely up to the jurisdiction of the church:

1. Matters of doctrine or faith. Lott v. Eastern Shore Christian Ctr., 908 So. 2d 922, 928 (Ala. 2005); Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am., 344 U.S. 94, 116 (1952); Watson v. Jones, 80 U.S. (13 Wall.) 679, 733 (1872).

2. Who is or who is not a church member, including expulsion or excommunication of members. Lott, 908 So. 2d at 928, 930; Mount Olive Baptist Church v. Williams, 529 So. 2d 972, 973 (Ala. 1988); Caples v. Nazareth Church of Hopewell Ass'n, 245 Ala. 656, 660, 18 So. 2d 383, 386 (1944); Gewin v. Mt. Pilgrim Baptist Church, 166 Ala. 345, 349, 51 So. 947, 948 (1909); Hundley v. Collins, 131 Ala. 234, 242-43, 32 So. 575, 578 (1902); Watson, 80 U.S. (13 Wall.) at 730, 733.

3. Ordinary acts of church discipline. Lott, 908 So. 2d at 928; Watson, 80 U.S. (13 Wall.) at 730, 733.

4. The hiring and firing of ministers. Taylor, 242 So. 3d at 983; Lott, 908 So. 2d at 930; Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC, 565 U.S. 171, 186 (2012).

49

5. Matters of church government or procedure. <u>Lott</u>, 908 So. 2d at 929-30; <u>Kedroff</u>, 344 U.S. at 116; <u>Watson</u>, 80 U.S. (13 Wall.) at 730.

<u>Second</u>, a civil court could have jurisdiction over the following matters:

1. Property rights, especially when a local church leaves a denomination or when there is a church split and competing factions are fighting over the property. <u>Trinity Presbyterian Church of Montgomery v. Tankersley</u>, 374 So. 2d 861, 865 (Ala. 1979); <u>Jones v. Wolf</u>, 443 U.S. 595, 602 (1979); <u>Mitchell v. Church of Christ at Mt. Olive</u>, 221 Ala. 315, 318, 128 So. 781, 783 (1930); <u>Watson</u>, 80 U.S. (13 Wall.) at 730.

2. Financial rights (such as salary, emoluments, and related matters based on contracts and disconnected from spiritual matters). <u>St. Union Baptist Church, Inc. v. Howard</u>, 211 So. 3d 804, 812 (Ala. 2016); <u>State ex rel. McNeill v. Bibb St. Church</u>, 84 Ala. 23, 33, 4 So. 40, 40 (1888).

3. Crimes and torts. <u>Watson</u>, 80 U.S. (13 Wall.) at 733; <u>Yates v. El Bethel Primitive Baptist Church</u>, 847 So. 2d 331, 368 (Ala. 2002) (Moore, C.J., dissenting).

Third, and perhaps most importantly, a civil court likely does not have jurisdiction in mixed cases if the underlying dispute is ecclesiastical in nature. For instance, in property or financial cases, we have held that civil courts do not have jurisdiction if the underlying dispute is ecclesiastical in nature. Taylor, 242 So. 3d at 995; Mount Olive Primitive Baptist Church v. Patrick, 252 Ala. 672, 674, 42 So. 2d 617, 618 (1949). Indeed, the United States Supreme Court has warned that "the First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes." Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church, 393 U.S. 440, 449 (1969) (emphasis added). Likewise, if a tort action (such as a defamation action) arises out of an ecclesiastical affair -- the hiring and firing of ministers, ordinary acts of church discipline, or the expulsion of members, for instance -- then the court probably does not have jurisdiction. Ex parte Bole, 103 So. 3d 40, 72 (Ala. 2012). It stands to reason that if the courts lack subject-matter jurisdiction over civil cases

51

when the underlying issue is ecclesiastical, then they may lack subject-matter jurisdiction in the criminal context, too.[16]

The foregoing demonstrates that church-dispute cases involving <u>purely</u> civil affairs rarely arise. On the contrary, cases that appear to be civil in nature are often ecclesiastical. For that reason, courts should be reluctant to "'assume jurisdiction'" in church cases. <u>Taylor</u>, 242 So. 3d at 986 (citation omitted). Even if it appears that courts have jurisdiction, they should proceed with extreme caution, because they "navigate a veritable minefield whenever they involve themselves in church matters." <u>Ex parte Board of Trustees/Directors and/or Deacons of Old Elam Baptist Church</u>, 983 So. 2d 1079, 1097 (Ala. 2007) (Parker, J., concurring specially).

The main opinion paints a different picture, as if one side of the field is laced with mines and the other is not, neatly divided by a bright picket fence between the two. See ___ So. 3d at ____ (positing that "civil

---

[16]Some churches during COVID certainly thought so. See, e.g., <u>Christ, Not Caesar, Is the Head of the Church: A Biblical Case for the Church's Duty to Remain Open</u>, Grace Community Church (July 24, 2020) (arguing that the State had no jurisdiction to order the church to stop assembling for worship) (at the time of this decision, this article could be located at: [https://www.gracechurch.org/news/posts/1988]).

courts can properly exercise jurisdiction to adjudicate church-related disputes as long as those disputes can be resolved (1) based on 'neutral principles of law' and (2) without resolving a religious controversy (that is, an issue of '"religious practice or doctrine"')"). In contrast, I believe the entire field is laced with mines with no easy signage inviting safe entry. It is an area fraught with danger, and we should usually stay out.

### III. The Specific Issue of Property Disputes

Although I object strongly to the main opinion's proposed grand and sweeping theory of church-dispute jurisprudence, I agree that, on the limited issue of property disputes, our precedents come down on the side of Harvest, not the petitioners. At the very least, the petitioners fail to demonstrate that they have a clear legal right to have the case dismissed. Accordingly, I concur with Parts I.C. and I.D. of the "Discussion" section of the main opinion.

As the main opinion accurately explains, both the precedents of this Court and of the United States Supreme Court have long held that civil courts have jurisdiction to adjudicate property disputes as long as doing so does not require resolving ecclesiastical questions. When the only question in a church-dispute case is who owns the real property, the

53

analysis is often more straightforward than it is in determining other types of cases, such as whether someone is a church member or whether church procedure was followed. See Part II, supra, of this special writing.

I must confess that I have reservations about how we decide such cases. The United States Supreme Court has suggested two ways of resolving such disputes: the hierarchical approach, in which the courts defer to whatever the denomination decides, and the neutral-principles-of-law approach, in which the courts examine deeds and other documents in secular terms to determine who gets the property. See Jones v. Wolf, 443 U.S. 595 (1979) (discussing the neutral-principles-of-law approach); Watson v. Jones, 80 U.S. (13 Wall.) 679 (1872) (discussing the hierarchical approach). Alabama adopted the neutral-principles-of-law approach in 1979 and has followed it since. Trinity Presbyterian Church of Montgomery v. Tankersley, 374 So. 2d 861 (Ala. 1979).

Both approaches have problems. The hierarchical approach has the intrinsic appeal of deference to the church, but it presumes that the hierarchical church is the true church. See, e.g., Adam J. MacLeod, Group Ownership and the Ends of Legal Fictions, 13 Faulkner U.L. Rev. 1, 14 (2021) (noting that the framing of a hierarchical-deference issue in a

Texas case opened the door to inviting the court to decide: "Who is the 'Church'?"); Mark A. Hicks, <u>The Art of Ecclesiastical War: Using the Legal System to Resolve Church Disputes</u>, 6 Liberty U.L. Rev. 531, 543 (2012) (noting Justice Rehnquist's concerns that deferring too much to hierarchical organizations could cause Establishment Clause problems); Jeffrey B. Hassler, <u>A Multitude of Sins? Constitutional Standards for Legal Resolution of Church Property Disputes in a Time of Escalating Intradenominational Strife</u>, 35 Pepp. L. Rev. 399, 429-30 (2008) ("The general effect of adopting an approach that always leads to the victory of the general church in any such dispute at least raises questions about whether that approach tends toward an impermissible establishment of religion."). In other words, when a congregation essentially claims that it is not leaving its denomination but that its denomination left it, deferring to the hierarchical church presumes that it is the "true church." What civil court has the authority (not to mention the capacity) to determine which faction is the "true church"?

On the other hand, the neutral-principles-of-law approach risks letting civil courts determine what religious documents mean. As Justice Mendheim wrote in a recent special concurrence,

"the neutral-principles-of-law approach hinges on what sources a court decides to consider in reaching a decision. Does it consider a church's constitution, membership rolls, the minutes of church-committee meetings, a hierarchical church's book of discipline, and other church-generated documents or does it just consider 'legal' documents such as articles of incorporation, contracts, and deeds?"

Sails v. Weeks, [Ms. SC-2023-0158, Apr. 5, 2024] ___ So. 3d ____, ____ (Ala. 2024) (Mendheim, J., concurring specially). Other justices and commentators have flagged similar concerns. See Burns Church, Inc. v. Alabama Dist. Council of Assemblies of God, Inc., 168 So. 3d 1188, 1195 (Ala. 2014) (Moore, C.J., dissenting) (arguing that the courts lacked jurisdiction to resolve church-property disputes when they were "based upon disparate interpretations of church governing documents"); Hicks, The Art of Ecclesiastical War, supra, at 557-58 (calling for clarification of the neutral-principles-of-law approach on the issue of where religious matters end and neutral principles of law begin); Hassler, A Multitude of Sins?, supra, at 430-44 (discussing the subtypes of neutral principles of law and their strengths and weaknesses).[17]

---

[17]Some scholars have suggested resolving church disputes through alternative dispute resolution ("ADR"), in which a mutually agreed-upon arbitrator who understands the religious issues has the authority to make the final decision. See Hicks, The Art of Ecclesiastical War, supra, at 553-56, 60-62 (arguing that ADR should be attempted before lawsuits

Despite my reservations about the neutral-principles-of-law approach, no party in this case has asked us to reconsider our precedents. Because there is not a clear alternative, I will follow our precedents and apply them to this matter. See 1 William Blackstone, Commentaries *70 ("The doctrine of the law then is this: that precedents and rules must be followed, unless flatly absurd or unjust."); Gamble v. United States, 587 U.S. 678, 720 (2019) (Thomas, J., concurring) ("Although precedent does not supersede the original meaning of a legal text, it may remain relevant when it is not demonstrably erroneous."); Jay Mitchell, Textualism in Alabama, 74 Ala. L. Rev. 1089, 1116 (2023) (noting that the Alabama Supreme Court "tends to adhere more closely to Justice Thomas's approach to stare decisis"). Moreover, we are not being called to determine in this case whether Harvest is still a part of the UMC, whether Harvest may disaffiliate from the UMC, or whether church

---

in accordance with Matthew 18:15-17 and 1 Corinthians 6:1-8 and that including an ADR clause in church documents would prevent the courts from adjudicating the dispute); Hassler, A Multitude of Sins?, supra, at 452-53 (listing several high-profile examples of ADR in church disputes and also drawing on 1 Corinthians 6:1-8). However, if the parties cannot mutually agree upon ADR, then the courts have no authority to force them to do so.

procedure has been followed. Therefore, I believe we may apply neutral principles of law to the limited issues presented to us.

As explained in the introduction to this special writing, I believe that our precedents addressing property disputes in church cases come down on Harvest's side, not the petitioners'. In particular, the trend in our cases is for the court to enforce the deed. See <u>Haney's Chapel</u>, 716 So. 2d at 1160; <u>St. Paul Methodist Church of Selmont</u>, 362 So. 2d at 874; <u>Crum</u>, 746 So. 2d at 1017. The main opinion follows our well-established principles and rightly observes that the petitioners' arguments to the contrary are unavailing. Thus, I join the main opinion as to this limited issue.

IV. The Basis for Our Limited Jurisdiction

Finally, I am concerned about an additional, but imprecise, implication of the main opinion's holding: that our jurisdictional limitations are grounded <u>only</u> in the First Amendment to the United States Constitution. But as Justice Mendheim recently observed, "for roughly the first 150 years of this country's jurisprudence, the First Amendment was not the inflection point for discussing the judiciary's role in settling church disputes." <u>Sails</u>, ___ So. 3d at ____ (Mendheim, J.,

58

concurring specially). Though the United States Supreme Court decided its first church-dispute case in 1872, it was not until 1969 -- nearly 100 years later -- that it finally invoked the First Amendment as a basis for limiting the civil courts' jurisdiction to adjudicate church disputes. Id. at ___. This Court likewise did not invoke the First Amendment in church-dispute cases until 1969, even though it had been holding that civil courts lack jurisdiction to adjudicate church disputes since at least 1902. Id. at ___. While I agree that the First Amendment provides an additional reason why we lack jurisdiction over many church-dispute cases, the historical records suggests that there must be a deeper reason why we have no jurisdiction over such cases.

Alabama's church-state jurisdictional separation has developed not in a vacuum, but from a rich American heritage of religious liberty that arose during the founding era based on the belief that church and civil government serve different roles under God. At the time of the American founding, the sentiment was growing among our people that the civil government had no jurisdiction over the church. Thomas Jefferson's and James Madison's efforts to free the church from the civil government in Virginia helped set the stage for religious freedom at the federal level and

the eventual disestablishment of government-run churches among the states.

Jefferson's and Madison's efforts reflected the People's growing belief that church and state had different roles (and therefore different jurisdictions) under God. Jefferson's Bill for Establishing Religious Freedom began:

> "Almighty God hath created the mind free, and manifested his Supreme will that free it shall remain, by making it altogether insusceptible of restraint: That all attempts to influence it by temporal punishments or burthens, or by civil incapacitations, tend only to beget habits of hypocrisy and meanness, and are a departure from the plan of the holy author of our religion, who being Lord both of body and mind, yet chose not to propagate it by coercions on either, as was in his Almighty power to do, but to extend it by its influence on reason alone."

Thomas Jefferson, A Bill for Establishing Religious Freedom (June 12, 1779), in 5 The Founders' Constitution 77 (Philip B. Kurkland & Ralph Lerner, eds., 1987) ("The Founders' Constitution"). Jefferson recognized that it was not in God's will for the civil government to enforce religious orthodoxy through the power of the sword. Jefferson's position was consistent with Protestant minorities like Baptists, Presbyterians, Lutherans, and Quakers, who objected to the Episcopalian establishment in Virginia. Michael W. McConnell, The Origins and Historical

Understanding of Free Exercise of Religion, 103 Harv. L. Rev. 1409,
1422-24 (1990) ("Origins and Historical Understanding"). While
Jefferson himself did not identify as a member of one of those Protestant
minorities, he and his Protestant-minority allies shared a common belief
that God did not give the civil government jurisdiction to determine and
enforce religious orthodoxy and that, therefore, the church should be free
from government control. See id. at 1437-41.

James Madison also shared this view. He began his Memorial and
Remonstrance Against Religious Assessments as follows:

> "Because we hold it for a fundamental and undeniable truth,
> 'that Religion or the duty which we owe to our Creator and the
> manner of discharging it, can be directed only by reason and
> conviction, not by force or violence.' … The Religion then of
> every man must be left to the conviction and conscience of
> every man; and it is the right of every man to exercise it as
> these may dictate. This right is in its nature an unalienable
> right. It is unalienable, because the opinions of men,
> depending only on the evidence contemplated by their own
> minds cannot follow the dictates of other men: It is
> unalienable also, because what is here a right towards men,
> is a duty towards the Creator. It is the duty of every man to
> render to the Creator such homage and such only as he
> believes to be acceptable to him. This duty is precedent, both
> in order of time and in degree of obligation, to the claims of
> Civil Society. Before any man can be considered as a member
> of Civil Society, he must be considered as a subject of the
> Governour of the Universe: And if a member of Civil Society,
> who enters into any subordinate Association, must always do
> it with a reservation of his duty to the General Authority;

> much more must every man who becomes a member of any particular Civil Society, do it with a saving of his allegiance to the Universal Sovereign. We maintain therefore that in matters of Religion, no mans [sic] right is abridged by the institution of Civil Society and that Religion is wholly exempt from its cognizance."

James Madison, Memorial and Remonstrance Against Religious Assessments (June 20, 1785), in 5 The Founders' Constitution 82. Like Jefferson before him, Madison's basis for jurisdictional separation of church and state was based on the belief that God was real and therefore our duties to Him outrank our duties to the State. Therefore, as Professor Michael McConnell has noted, "Madison advocated a jurisdictional division between religion and government based on the demands of religion rather than solely on the interests of society." McConnell, Origins and Historical Understanding at 1453.

When Alabama became a state several decades later in 1819, it followed the lead of Jefferson, Madison, and the People who supported their view. The new Alabama Constitution declined to establish a state-run church. Instead, it contained five religious-freedom provisions that guaranteed the church's freedom from state interference. Art. I, §§ 3-7, Ala. Const. 1819. Every Alabama Constitution since then has contained similar guarantees that the church may govern itself free from state

interference. See Art. I, §§ 3-3.02, Ala. Const. 2022; Art. I, §§ 3-3.02, Ala. Const. 1901; Art. I, § 4, Ala. Const. 1875; Art. I, §§ 4-5, Ala. Const. 1868; Art. I, §§ 3-4, Ala. Const. 1865; Art. I, §§ 3-7, Ala. Const. 1861.

The text of the Alabama Constitution demonstrates that the People of this state agreed -- and still agree -- with the view that the church and the state have different jurisdictions under God. Article I, § 3, of the Alabama Constitution of 1819 provided: "No person within this State shall, upon any pretence, be deprived of the inestimable privilege of worshiping God in the manner most agreeable to his own conscience ...." The People ratifying the Alabama Constitution of 1819 presumed that there is a God, and therefore the right to worship Him according to the dictates of one's conscience cannot be taken away. This logic fits perfectly with Jefferson and Madison's view of religious liberty. Our current Constitution still acknowledges that God exists,[18] that our rights come from Him,[19] and that "[e]very person shall be at liberty to worship God

---

[18]The preamble of the Alabama Constitution of 2022 invokes "the favor and guidance of Almighty God" in establishing and ordaining the Constitution of this State.

[19]Art. I, § 1, Ala. Const. 2022.

according to the dictates of his or her own conscience."[20] Just as the People of our State did at its founding, the State still recognizes that, under God, it must respect the jurisdiction of the church.

V. Conclusion

The petitioners asked this Court for a writ of mandamus ordering the trial court to dismiss the action for lack of subject-matter jurisdiction and for lack of personal jurisdiction over the GCFA. The main opinion holds in Parts I.C. and I.D. of the "Discussion" section that the petitioners have failed to demonstrate that they have a clear legal right to the relief they seek under our church-property precedents, and it holds in Part II of the "Discussion" section that the GCFA has failed to demonstrate that it has a clear legal right to dismissal for lack of personal jurisdiction. Those parts of the opinion are sufficient to answer the questions before us. Accordingly, I concur in those parts of the main opinion and, based solely on the analysis contained in those parts, I concur in the result to deny the mandamus petition.

But the main opinion goes much further than that, purporting to overhaul our entire church-dispute jurisprudence in what is, I believe,

_____

[20]Art. I, § 3.02, Ala. Const. 2022.

dicta. If, in the future, this Court adopts that dicta, I fear that the ambitious and ahistorical approach to resolving church-dispute cases set out in the main opinion will prove unworkable in practice. This Court may come to that realization eventually, just as the United States Supreme Court eventually did with the Lemon test. See Kennedy v. Bremerton Sch. Dist., 597 U.S. 507, 534 (2022) ("the 'shortcomings' associated with this 'ambitiou[s],' abstract, and ahistorical approach to the Establishment Clause became so 'apparent'" that the Court "abandoned Lemon and its endorsement test offshoot" (citation omitted)). My fear is that, in the meantime, churches will face tremendous uncertainty in litigation, especially if their autonomy is tied to what the United States Supreme Court has said about the First Amendment. For these reasons, I do not join Parts I.A. and I.B. of the "Discussion" section of the main opinion. While our precedents provided a narrow path through the minefield in this case, today's decision should not be taken as a sign that the minefield is generally safe to cross.

SELLERS, Justice (concurring in the result).

I concur with the main opinion that the Alabama-West Florida Conference of the United Methodist Church, Inc. ("the AWFC"), and the General Council on Finance and Administration of the United Methodist Church ("the GCFA") failed to demonstrate a clear legal right to have the underlying action dismissed for lack of subject-matter jurisdiction based on the ecclesiastical abstention doctrine or for lack of personal jurisdiction over the GCFA.

I offer the following observations regarding the subject-matter-jurisdiction issue. In this case, Harvest Church-Dothan ("Harvest") claims sole ownership of local church property based on the deed titled in its name, yet the United Methodist Church's Book of Discipline ("the Discipline") requires that local church property be held in trust for the benefit of the entire denomination, i.e., The United Methodist Church ("the UMC"). To this end, the Discipline requires that local churches include a specific trust clause in their deeds and that they reference that trust clause in their organizational documents. The AWFC and the GCFA claim that the conflict presented regarding ownership of the local church property cannot be resolved under neutral principles of law. However, in

66

my opinion, once Harvest used the civil legal system to file its deed and organizational documents, it consented to have secular law applied to its filings and, thus, opened the door to have any property dispute resolved pursuant to neutral principles of law. If the question presented in this case involved a vote on theological matters or the approval of a doctrinal test for membership, the trial court would have no jurisdiction. I also posit an inverse scenario. What if, before Harvest commenced the underlying action, the AWFC or the GCFA discovered that Harvest had failed to comply with the trust provisions of the Discipline and demanded that Harvest amend its deed and organizational documents to reflect that the local church property was held in trust for the benefit of the UMC, but to no avail? Under such a scenario, the AWFC and the GCFA, being ecclesiastical entities, would have no means in and of themselves to amend the secular documents of Harvest; nor does it appear that they could legally force Harvest to do so. Rather, the AWFC and the GCFA would necessarily have to rely on our civil legal system to achieve their desired outcome. Indeed, only civil courts can interpret and enforce the terms of deeds and organizational documents. In any dispute regarding the ownership of real property, only civil courts can analyze the actions

of an organization to confirm that the laws were properly followed, that the organization's actions were duly authorized, and that a public filing accurately reflects the exercise of such authority. In this case, the AWFC and the GCFA have not demonstrated a clear legal right to have the underlying property dispute dismissed for lack of subject-matter jurisdiction based on the ecclesiastical abstention doctrine.